[Title No. 6297.]

C. F. BOWERS, Respondent, v. GREAT NORTHERN RAILWAY COMPANY, a Corporation, Appellant.

(259 N. W. 99, 99 A.L.R. 1443.)

Opinion filed January 7, 1935.  Rehearing denied March 13, 1935.

*Lawrence, Murphy, Fuller & Powers* and *Murphy & Toner,* for appellant.

*Emanuel Sgutt,* for respondent.

MOELLRING, J. Plaintiff brings this action to recover damages sustained to an automobile for alleged negligence of the defendant. A trial was had in the lower court which resulted in a verdict and judgment in favor of the plaintiff. On this appeal defendant presents ten assignments of error. At the close of plaintiff's case defendant made a motion to dismiss the action, which motion was denied; whereupon defendant moved for a directed verdict in favor of the defendant for dismissal of the case, which was also denied. At the close of the evidence defendant again made a motion for dismissal of the action, which likewise was denied. These assignments of error are known as assignments Nos. 5, 6 and 7, respectively.

There is very little dispute in the evidence, and the record discloses that on December 23, 1933, plaintiff was driving a Buick eight-cylinder coupe from Minneapolis, Minnesota, to Fargo, North Dakota, on highway No. 2. Riding with him in the same seat were his sister, Mrs. Alta Johnson, and her daughter. At the village of Glyndon, Minnesota, highway No. 2 is intersected by defendant's railway line at right angles. The weather was very cold and a blizzard was prevailing. While proceeding on this highway at about 9:30 o'clock in the evening, and while a freight train of the defendant was standing across said highway at Glyndon, plaintiff's coupe collided with one of the box cars which constituted part of the train.

The complaint alleges, and it is the contention of the plaintiff, that at the time the collision occurred the defendant was guilty of negligence by obstructing the highway with its train, and the particular grounds of such alleged negligence are stated in the complaint thus:

"That at said time and place, the defendant and its servants moved a freight train of the defendant on same public crossing and negligently and carelessly left said train there obstructing and blocking said highway and crossing during the nighttime and without keeping any lookout, flagmen or guard at said crossing or displaying proper warning lights, signs or signals, and without properly protecting crossing and without in any way warning the plaintiff or any travelers of the presence of such obstacle, although it was dark and during a severe storm, making it difficult for travelers to see said train; all of which was without due regard or care for the lives and safety of travelers on public highway No. 2 and their property and particularly the property of the plaintiff."

The defendant in its answer denies that it was negligent and states that it was acting clearly within its right and in the usual and ordinary use of its tracks across the highway at the time the collision occurred; and that if the property of the plaintiff was damaged the same was due to the lack of ordinary care and contributory negligence of the plaintiff. The issues presented by the pleadings, therefore, are (1) Was the defendant guilty of any negligence which proximately contributed to the plaintiff's damage, and (2) Was the plaintiff guilty of negligence proximately contributing to his damage?

As assignments of error Nos. 5, 6 and 7 challenge the whole record as

to whether or not there are sufficient facts to support the verdict as a matter of law, it is necessary, therefore, that we search the whole record and consider all the material facts disclosed.

The evidence shows, further, that the freight train left Crookston, Minnesota, that evening en route to Barnesville, in the same state, and arrived at Glyndon a very short time before the collision occurred. A line of the Northern Pacific Railway intersects the said line of the defendant at Glyndon, and at the point of intersection there is an interlocking and derailing system; also a semaphore arrangement with appropriate visual signals, including lights, to indicate whether an approaching train may proceed or otherwise. If the semaphore signals are set against proceeding, then a stop must be made or the train would be derailed. The engineer who drove the locomotive that pulled the train testified that they had orders to run from Crookston to Barnesville without stopping. However, it was their duty to respect the semaphore signals at the intersection. The train arrived at Glyndon under control, and the engineer testified that he gave the usual warning on approaching the crossing. The engine was equipped with a headlight which was burning brightly, and the rear of the train was protected by appropriate lights on the caboose, which reflected to the rear, front and sides. The engineer was unable to see the lights of the semaphore until the locomotive had passed over the crossing a distance of about one hundred feet. Immediately upon discovering that the signals were against him he applied the brakes and the train came to a stop in the usual distance with the locomotive about two hundred feet from the crossing, a portion of the train extending over the crossing. As soon as the train came to a full stop he immediately gave the signal preliminary to backing the train, and it was while he was giving this warning that the fireman first observed plaintiff's automobile approaching on the highway. As soon as the whistle stopped blowing he told the engineer that a car was approaching and not to move the train. The engineer testified: "Q. Did you immediately back up? A. No. Q. Why? A. The fireman was looking back on his side and he seen a car coming and he said, 'Don't move, there's a car coming.' He says, 'They hit.' ".

The fireman testified in part: "A. Well, immediately after we stopped why the engineer says, 'We'll back off the crossing,' and he

whistled to back up. Q. What kind of a whistle is that? A. Three short blasts. Q. Long or short? A. Three short blasts. Q. While he was doing that what were you doing? A. Watching out. Q. While he was blowing the whistle did you see anything? A. See an automobile coming toward the track. Q. That was on the highway? A. Yes." He testified further: "Q. At the time you first saw the car was the whistle blowing? A. Yes. Q. So that at that time you didn't tell the engineer a car was coming? A. That requires about two seconds." Again he testified: "Q. Well, for how long a distance did you see that car coming? A. Well, I could see that car coming from way over at the garage there. Q. Was that quite a ways back? A. Yes, I never measured it but they testified here about a block and a half." He testified further: "Q. He was whistling at that time. Now, did you say anything to the engineer as he quit whistling? A. He couldn't hear me talk until he stopped whistling. Then I told him, 'Don't move, there's a car coming.'" He testified, also, that the automobile was traveling at a speed of about twenty-five miles an hour and that its speed was the same when it struck the box car.

The train crew consisted of the conductor, engineer, fireman and two brakemen. The head brakeman testified that as soon as the train stopped he and the other brakeman left the caboose at the rear of the train and walked towards the engine, which would also be in the direction of the crossing; that he proceeded along the east side of the train and the other brakeman on the opposite side. He stated that it was customary for the brakemen to get out and inspect the train as soon as it stopped, that he saw the lights of the automobile approaching from the east on the highway, and that he was about two hundred feet from the crossing when the collision occurred. He was carrying a lighted lantern at the time, and when he first saw the approaching coupe, it was between the garage and the restaurant. The undisputed evidence in the case shows that the restaurant is about one block from the crossing and that the garage is about one and one-half blocks. The head brakeman also stated that the automobile approached at a speed of from twenty to twenty-five miles an hour and was traveling at the same rate when it struck the train.

Plaintiff testified that they first struck the snow storm after they left Wadena, Minnesota, which would be about sixty-five miles from

Glyndon, and stated that the storm grew worse as they proceeded. There was no heating apparatus in the coupe and plaintiff and his passengers stopped at Hawley eleven miles from Glyndon to get warm. Plaintiff was familiar with the highway and the railroad. He said he was born at Fargo and lived there at all times until about six years ago when he went to Ames, Iowa, where he has been occupied at all times since as an instructor in a college. Glyndon is about ten miles from Fargo. Plaintiff stated he had traveled over this road many times, was over it several times during the last six years and had traveled it last summer. He knew that Glyndon was eleven miles from Hawley, that highway No. 2 passed through the village, and that the railroad tracks were on the west side of the village. He testified, in part: "Q. Were there no lights in that town at all? (Meaning the village of Glyndon.) A. I don't remember going through the town. Q. I see, and this garage that you went back to after the collision, half a block or block, whatever it was, from the crossing, was that along the highway where you had come in? A. Yes, it was. Q. Were there lights in there? A. I recollect seeing lights. I didn't know that it was Glyndon. I thought perhaps it might be a few farm houses grouped along the highway as it was very stormy."

On the north side of the highway immediately next to the roadbed and within three or four hundred feet of the crossing, the evidence shows there existed a regular highway disk sign about three feet in diameter, indicating approach to a railroad crossing. Plaintiff testified he did not see this crossing sign and did not know he was near the tracks. He also testified, in part: "Q. Was it quite cold that night? A. Yes, very cold. Q. What were the other weather conditions? A. There were gusts of snow blowing across the road. I guess you could describe the weather condition as that of a blizzard. The wind was laden with snow and at times there the visibility was very poor. . However, the snow laden wind swept across the road in gusts so that at times the visibility was fairly good and at other times you couldn't see ten or fifteen feet in front of you."

Plaintiff also testified that when they left Hawley it was very dark with blowing snow and visibility poor all the way from Hawley to Glyndon. He stated that he did not exceed thirty miles per hour between the two towns; and that he thought his average was about twenty

miles. He testified further: "Q. Did you see any railroad warning signs along the road just previous to the collision? A. No. I didn't see any warning signs whatsoever. Q. Tell what happened just prior to the collision? A. Well, we were driving along there and my sister made some sort of statement about a train. Well, immediately it threw some sort of a scare in me and I put on my brakes. It wasn't a fraction of a second after that when we hit the train. Q. Did you see the train at all before you hit it? A. Yes, I did see it before we hit it."

He also stated that Mrs. Johnson spoke to him or made inquiry as to whether there was a train in the vicinity at the time he was approximately thirty feet from the railroad tracks but he did not see it. He states further that he immediately put on the brakes while traveling approximately twenty miles an hour and slowed down, and that he did not see the cars blocking the road until he was approximately ten or twelve feet from the crossing.

Mrs. Alta Johnson, who was a passenger in plaintiff's automobile, testified that she was familiar with the road, having been over it many times, and also knew the location of the crossing at Glyndon. She stated that the windshield in front of her was not frosted but that there was some frost on the right hand side, although it did not interfere with her vision and that she looked ahead at the road constantly. She testified, in part: "Q. About how far ahead of you could you see? A. Very short distance. I couldn't estimate how far. Q. What was the reason for that? A. The flurries of snow would obstruct the view and it was storming and, of course, we couldn't see on account of the storm." She testified further: "Q. Now you made some remark to Mr. Bowers a little while or just before the accident in regard to there being tracks in the vicinity, or there being a train, or some such remark. Remember making a remark like that? A. I said, 'Is there a train around here?' Q. Is that what you think you said? A. Yes. I know I said, 'Is there a train or crossing?' I said, 'Is there a train around here?' Q. At that time did you see any train? A. Absolutely nothing. Q. Had you seen any tracks. A. Nothing. Q. Had you seen any sign that would indicate you were coming to a crossing? A. No, I did not." The question was asked: "Were you looking for that crossing? A. Yes, I was." She testified further: "Q. Did you hear any engine whistle? A. Absolutely not. Q. You also made a

statement on the 28th of December respecting the circumstances of the accident? A. I did. Q. Do you recall having made this statement, 'Just before we struck the freight car I saw a light to the left about two blocks away. I did not know what this light was and it was not pointing toward us. However, I made the remark to my brother, "Is there a train around here?" or words to that effect, and he immediately applied his brakes. At the time I did not see any cars blocking the crossing. However a dark object loomed up ahead of us and we struck it. This was a very few seconds after he applied his brakes.' Is that correct? A. I believe that is my statement."

Again she testified: "Q. On the left hand side of the road for approximately two blocks, three blocks, there are lines of houses, are there not? A. Yes. Q. And then you come to the garage where Mr. Bowers afterwards got the school bus. Then there is a distance of about a block of open country before you hit the railroad track? A. Yes. Q. Now do you want this jury to understand you passed through this town and did not realize you were passing through a town? A. Absolutely. I had no idea I passed through the town."

In determining whether or not defendant is guilty of negligence, it is necessary to ascertain what duties, if any, were imposed upon defendant, in the circumstances, that it failed to perform. The crossing is open and unobstructed. The country around is practically level and on approaching the tracks from the east, beginning at a distance of about three hundred feet from the crossing, when visibility is good, there is an unobstructed view of the track in either direction as far as the eye can see. This the plaintiff admits in his testimony. There is no evidence in the record to the effect that the crossing is one which ordinarily requires any special warning signs or devices. There is no evidence as to the extent of the traffic generally upon this highway and, in fact, so far as the evidence indicates, the only travelers upon the highway that night, were plaintiff and his companions. Plaintiff contends solely that because the defendant obstructed the highway crossing, in view of the blizzard prevailing that night, a duty was imposed upon defendant to use additional means of warning, commensurate with the situation at the time, to inform the traffic that the highway was temporarily obstructed.

It is plain, however, that defendant had the right to proceed with

its train despite the storm just as plaintiff had the right to use the road, and it had the right to cross the highway and to stop on the crossing temporarily when necessary in the operation of its train. Had the collision occurred at a time when the train was in the act of moving over the crossing in a regular way, it could hardly be claimed that the collision would be due to negligent acts on the part of the defendant, even though it was in the nighttime with a blizzard prevailing. In some jurisdictions by statute it is made unlawful for a train to occupy a crossing with standing cars longer than a definite time prescribed, nevertheless it is held that where standing cars have exceeded the statutory time and injuries are sustained, the obstruction of the highway is not considered as the efficient cause of such injuries but merely as a condition which of itself furnishes no cause of action.

In the case of Gilman v. Central Vermont R. Co. 93 Vt. 340, 107 A. 122, 16 A.L.R. 1102, it was held that blocking a highway crossing by a standing train longer than allowed by statute does not render the railroad company liable for damages to an automobile colliding with the train, if the violation of the statute was a condition and not the cause of the accident. In that case it was also held that the crew in charge of a freight train standing on a highway crossing at night are justified in believing that persons traveling in an automobile, properly lighted and driven, will be able to see the cars before the machine collides with the train, and are therefore not negligent in failing to station a man with a lantern at the crossing to warn travelers of the presence of the train.

In the case of Hendley v. Chicago & N. W. R. Co. 198 Wis. 569, 225 N. W. 205, where a motor vehicle collided with standing cars on a highway crossing, the court said:

"We see no causal connection between the alleged violation of this provision and the injury to the plaintiff upon which could be predicated a liability of the defendant railroad company. It is clear that it was not because of the standing of the train the extra five minutes beyond the statutory ten minutes that could make the railroad company responsible. The same result would have followed had this crossing been approached by the plaintiff seven minutes earlier. The lapse of time therefore went no further than to create the condition in which the accident occurred as distinguished from the cause thereof."

In the instant case no laws of the state of Minnesota have been cited or proven to indicate that defendant had violated any statutory provision or common law duty by obstructing the highway at the crossing. If the plaintiff had arrived on the scene a few moments earlier and while the train was moving over the crossing, it is evident that the results would have been the same. As stated, the laws of the state of Minnesota have not been proven in the evidence as the law of the case, and in determining this matter it is therefore necessary for us to presume that the laws of Minnesota with reference to the facts in this case are the same as the laws of this state. Subdivision 41, § 7636, Compiled Laws of 1913, as amended by chapter 213, Laws of 1933. The precise legal questions involved in this case have never been determined, heretofore, by this court.

If we assume that an additional duty was imposed upon the defendant because of the fact that the night was exceedingly dark and stormy, then certainly the crew, if it had acted with the utmost diligence, did not have time to place any additional warnings from the time the train stopped to the time the collision occurred. Upon stopping the train the engineer immediately gave the signal preliminary to backing the train. While giving this signal which occupied but a few moments or a few seconds at most, the fireman first observed the approaching automobile. The evidence discloses that at the time the fireman and the head brakeman first saw the coupe, it was less than one and one-half blocks distant from the train. If it was traveling at a rate of twenty miles an hour—and plaintiff admitted it was moving at about that rate immediately before he applied the brakes— less than twenty seconds must have elapsed from the time the fireman and the brakeman first saw the approaching coupe until it collided.

Moreover, as soon as the train stopped the engineer gave the usual backing up signal. This would indicate to the other members of the crew that the train was about to back off the crossing, and while it is not indicated in the record just how long it would take the train to move backward two hundred feet and thus clear the crossing, the evidence does show that it was not a long or heavy train, and it is common knowledge that the time required to move a train of such character, that distance, would be very short, and certainly before any

warning signs could have been placed on the highway approaches by the crew if they had determined to do so.

In the case of Nadasky v. Public Serv. R. Co. 97 N. J. L. 400, 117 A. 478, a recovery was denied where an automobile was driven into a train standing across a highway. The court said, in part:

"Of course, a railroad company cannot lawfully obstruct the public highway for an unreasonable length of time. It is elementary it may lawfully propel its trains across the highway, and thereby obstruct the crossing for such period as is reasonably necessary for the passage of said trains. It is also the common practice in many places for the railroad to drill their trains in such a manner as to obstruct a crossing intermittently or for considerable periods of time not more than is reasonably necessary for the purpose of completing the drill. It may not utilize the crossing as a station for railroad cars for an indefinite period. . . .

"Assuming, therefore, as we should assume on the proof or lack of proof in this case that the defendant had not occupied the crossing with its car for more than a lawful period, the question is whether it was obliged in the execution of its duty towards the public to light up the car so that travelers upon the highway would see the lights and be warned of its presence at that point. We make nothing of the signals that have been spoken of above; these were manifestly intended for the warning of travelers, when the crossing should be, in fact unobstructed, that a car or train was approaching, and that they were liable to be struck if they attempted to cross; the plaintiff had no right to rely upon them as warning of something which was actually in possession of the crossing in plain sight and visible except for the temporary conditions of darkness. As to an obstruction of this kind, we have the authority of Jacobson v. New York, S. & W. R. Co. 87 N. J. L. 378, 94 A. 577, where a substantially similar case was presented and in which it was held that there was no duty to warn or to show lights, and this decision, we think, is controlling in the present case."

In the case of Philadelphia & R. R. Co. v. Dillon, 31 Del. 247, 114 A. 62, 15 A.L.R. 894 (annotated), it was held that a railroad company blocking a highway with a standing train at night has a right to assume that one driving an automobile along the highway will adopt

such lights and rate of speed that he can bring his machine to a standstill within the distance that he can plainly see the obstacle and therefore is not negligent in failing to give warning of the presence of the train.

In Crosby v. Great Northern R. Co. 187 Minn. 263, 245 N. W. 31, decided November 4, 1932, plaintiff had driven his automobile in the nighttime against the side of a freight train slowly moving over the crossing. In denying recovery as a matter of law, the court said, in part: "Subject to legislative restriction, which is not here violated, it is not negligence in itself for a railroad company to allow a train of cars to stand on a highway crossing, or to move thereon," and cited many authorities. The court said further:

"Defendant was carrying on a legitimate business in a lawful manner. Reasonable operation of its business does not require lights on the side of each or any of the cars of a standing or moving train. Neither is it reasonable to expect or require a railroad company to have men with lanterns on the ground when trains pass in the night."

We quote further:

"Common experience is that the occupation of a highway crossing by a train is visible to travelers on the highway including automobile drivers whose cars are properly equipped with lights and who exercise ordinary care. It would seem that a train upon a crossing is itself effective and adequate warning. It has always been so considered. This is so whether the train is moving or standing. A railroad company is under no obligation to light an ordinary highway crossing at night so that its trains thereon may be seen by travelers."

The court also held that a railroad company "must take such precaution as prudent management with respect to public safety requires, though such precaution may be in addition to the requirement of the statute or though there may be no statute upon the subject." The court determined, as a matter of law, that there was no negligence on the part of the railroad company.

The Minnesota case from which we have quoted was decided a little more than one year prior to the occurrence of the collision in question in the case at bar.

In the case of McFadden v. Northern P. R. Co. 157 Wash. 437, 289 P. 1, it was held that where a motorist drove his car into a train in a

fog at an unlighted but familiar street crossing, his act was contributory negligence as a matter of law.

In the case of Morris v. Atlantic City R. Co. 100 N. J. L. 328, 126 A. 295, the undisputed evidence showed that the night was dark and foggy when the plaintiff who was the owner of a motor truck was proceeding slowly about two o'clock in the morning along the Transboro road, near Winslow Junction, en route from Atlantic City to Philadelphia. He was an experienced motorman, familiar with the route from frequent passage and drove his car slowly but became aware of the presence of the railroad tracks only when he reached the first track, which was too late to avoid a collision with a freight train which was occupying the crossing. In this case recovery was denied. The court said:

". . . It was also contended that in view of the extraordinary weather conditions, which prevented the plaintiff from obtaining a view much further than the hood of the trucks, the duty was imposed upon defendant of using extraordinary means of warning, commensurate with the situation. The plaintiff, fully acquainted with the environment, was aware that the crossing was unguarded, and possessed neither light, bell nor gates, while the impenetrable fog enveloped and obscured everything along the route. The learned trial court nonsuited, following the rule prescribed in Nadasky v. Public Serv. R. Co. 97 N. J. L. 400, 117 A. 478, and Jacobson v. New York, S. & W. R. Co. 87 N. J. L. 378, 94 A. 577.

"The conspicuous fact in the case is that at the time the railroad train was in actual possession of the crossing, and that the plaintiff collided with the train, and not the converse situation usually presented. To sustain a verdict in such a status it must reasonably appear that the damage resulted by reason of the non-performance by the defendant of some duty imposed upon it by law. . . .

"In the absence of such a situation, liability will not be inferred. The relative rights of the parties here were co-equal, and the extraordinary conditions enveloping road and crossing imposed no greater duty of care upon one than upon the other, each exercising a common right of passage. It becomes apparent, therefore, in the light of the adjudications upon which the learned trial court relied as a basis for the nonsuit, that the defendant, under the circumstances, had not vio-

lated any legal duty imposed upon it by law in occupying the crossing, . . ."

See also the following: Orton v. Pennsylvania R. Co. (C. C. A. 6th) 7 F. (2d) 36; St. Louis-San Francisco R. Co. v. Guthrie, 216 Ala. 613, 114 So. 215, 56 A.L.R. 1110, and note p. 1114; Trask v. Boston & M. R. Co. 219 Mass. 410, 106 N. E. 1022; Gulf, M. & N. R. Co. v. Holifield, 152 Miss. 674, 120 So. 750; Gulf, M. & N. R. Co. v. Kennard, 164 Miss. 380, 145 So. 110; Killen v. New York C. R. Co. 225 App. Div. 8, 232 N. Y. S. 76; Skinner v. Pennsylvania R. Co. 127 Ohio St. 69, 186 N. E. 722; Missouri, K. & T. R. Co. v. Long (Tex. Com. App.) 299 S. W. 854; Worden v. Chicago & N. W. R. Co. 180 Wis. 551, 193 N. W. 356.

Both plaintiff and his sister, Mrs. Johnson, knew of this crossing and in fact both were observing the road contemplating the crossing with its possible dangers. They knew, or should have known, that if a train reached the crossing before they did and was occupying it either in the course of passing or momentarily stopping thereon, a collision would occur unless the driver had his car under such control and could see sufficiently in advance to bring it to a stop before such contingency happened.

With reference to the conduct of the defendant and its diligence or lack of diligence, the ultimate facts are that the train was proceeding over the crossing in the usual and ordinary way with no intention on the part of the engineer to stop thereon, but when the locomotive was about one hundred feet beyond the crossing the semaphore signals were discovered to be against proceeding further. It was necessary that the train cease moving forward, otherwise it would be derailed. The engineer in stopping the train also had in mind and intended to take the train off the crossing as quickly as possible. Stopping the train was not only imperative to prevent derailment, but was a necessary incident in removing it from the crossing, and no doubt the train would have been proceeding backward at the time the collision occurred had not the fireman observed the approaching automobile and told the engineer not to move the train.

There is nothing in the evidence to indicate that the defendant could have done more than it did in the circumstances, and we fail to see wherein the defendant is guilty of non-performance of any duty im-

posed upon it by law. As our views on assignments of error Nos. 5, 6 and 7 dispose of the case, it is not necessary to consider the other errors assigned on the appeal.

The judgment is reversed, and the trial court is directed to dismiss the action.

BURKE, Ch. J., and NUESSLE, CHRISTIANSON and BURR, JJ., concur.