[File No. 6889]

HELENA E. CUNNINGHAM, as Administratrix of the Estate of William Burton Cunningham, Deceased, Plaintiff-Appellant, v. GREAT NORTHERN RAILWAY COMPANY, a Corporation, Defendant-Appellant.

(14 NW(2d) 753)

Opinion filed May 27, 1944

*Sinness & Duffy,* for plaintiff-appellant.

*Murphy, Toner & Kilgore,* for defendant appellant respondent.

CHRISTIANSON, J. The plaintiff, Helena E. Cunningham, is the widow of William Burton Cunningham, and the administratrix of his

estate. On October 6, 1941 said Cunningham was, and for more than twenty years prior thereto, had been, employed by the defendant railway company as a telegraph lineman. His work consisted principally of repairing telegraph lines along the main line between Devils Lake and Rugby, North Dakota and along the branch lines connecting with and running north from said main line. For the purposes of travel incident to such work Cunningham was furnished with a motor car, commonly known as a speeder.

On October 6, 1941 he made a trip to Leeds (a station between Devils Lake and Rugby) in the performance of his work as telegraph lineman. In making the trip he used the speeder. On returning to Devils Lake, at a point one and 85/100 miles west of the Devils Lake depot, Great Northern Train No. 4, an east-bound passenger train, ran into and collided with the speeder on which Cunningham was riding, and caused his death. The plaintiff, as administratrix of the estate of her deceased husband, brought this suit under the Federal Employers' Liability Act, 45 USCA §§ 51–59, 10A FCA title 45, §§ 51–59, claiming that her husband's death occurred in the course of his employment, and was due to the negligence of the defendant.

The charge of negligence is predicated upon three grounds: 1. That the train was operated at an excessive speed; 2. That the train was being run ahead of schedule time; and, 3. That the defendant had knowledge that the decedent, Cunningham, was on the track and took no proper precaution to prevent his being injured.

The defendant denied that it was negligent in any manner and alleged that the injury and death were the result of lack of care on the part of the decedent.

The case was tried to a jury and resulted in a verdict in favor of the plaintiff. The defendant moved in the alternative for judgment notwithstanding the verdict or for a new trial. The trial court denied the motion for judgment notwithstanding the verdict, but ordered a new trial. Both parties have appealed. The plaintiff claims that it was error to set aside the verdict and order a new trial; and the defendant claims that the trial court erred in denying its motion for judgment notwithstanding the verdict.

The several assignments of error, and the arguments presented in

support thereof, resolve to this: Is the evidence sufficient to sustain the verdict, or is the defendant entitled to a verdict and judgment as a matter of law?

In a memorandum decision denying the motion for judgment notwithstanding the verdict and ordering a new trial, the trial court said: "As the case now stands . . . the defendant is entitled to an order for judgment notwithstanding the verdict," but "there is a possibility on a new trial the plaintiff may be able to furnish the necessary evidence that at the time of the collision the train was running ahead of time and that such negligence was the proximate cause of the collision and injury . . . and the complaint can then be amended, specifically charging negligence on such ground."

There is a strong presumption in favor of an order granting a new trial on the ground of insufficiency of the evidence to support the verdict, and the order will not be disturbed in absence of clear showing that it is erroneous. Aylmer v. Adams, 30 ND 514, 520, 153 NW 419, 420; Kohlman v. Hyland, 56 ND 772, 777–779, 219 NW 228. Judgment notwithstanding the verdict will not be ordered because the evidence is insufficient to sustain the verdict even though the state of the evidence is such that the trial court ought to have directed a verdict or ordered a new trial on the ground of insufficiency of the evidence to sustain the verdict. In order to warrant ordering judgment notwithstanding the verdict for insufficiency of the evidence to sustain the verdict, it must further appear "that there is no reasonable probability that the defects in or objections to the proof necessary to support the verdict may be remedied upon another trial." First State Bank v. Kelly, 30 ND 84, 152 NW 125, Ann Cas 1917D 1044.

But where the evidence is insufficient to sustain the verdict, and it also clearly appears that there is no reasonable probability that the defects in or objections to the proof necessary to support the verdict may be remedied upon another trial, and that upon the whole record the party against whom the verdict was rendered is entitled to judgment upon the merits as a matter of law, the trial court, upon the motion of the party against whom the verdict was rendered for judgment notwithstanding the verdict, or in the alternative for such judgment or for a new trial, should order judgment notwithstanding the verdict;

and failure to so do constitutes error subject to review and correction on appeal. Section 7643, Supplement to the Compiled Laws of 1913; Laws 1935, c 245; Welch Mfg. Co. v. Herbst Dept. Store, 53 ND 42, 204 NW 849.

The great question presented for determination by the trial court in this case was whether the injury which caused the death of Cunningham was occasioned by the negligence of the defendant. The plaintiff had the burden of proving that it was.

For "in actions under the Federal Employers' Liability Act, as in other actions at law for injuries to employees, the burden is cast upon the plaintiff to show negligent conduct on the part of the employer constituting ground for recovery. The plaintiff must establish a breach of duty on the part of the defendant, and show that the misconduct was a foreseeable cause of the plaintiff's injury and that it was in fact the proximate cause of his injury." 35 Am Jur 944, Master and Servant, § 515.

Does the evidence which was adduced upon the trial show a state of facts from which reasonable and fair-minded men in the exercise of reason and judgment could find that the injury which caused the death of Cunningham was occasioned by the negligence of the defendant? That is the question which the parties have presented for determination in this court.

Both parties assail the order for a new trial. There is no claim by either party that there is any likelihood that any substantial additional evidence can be adduced upon another trial. The claim is to the contrary.

In plaintiff's brief on this appeal it is said: "The evidence insofar as the plaintiff is concerned is substantially in documentary form. There is no reason to suppose that it can be changed upon a new trial. Under that evidence the jury was or was not justified in finding the defendant negligent. If it was, then the plaintiff ought not to be forced to go to the expense of a new trial and the judgment ought to be affirmed. If that evidence is not sufficient, then the defendant ought not to be put to the expense of a new trial and the cross appeal should be granted."

In a memorandum opinion the trial court said that he ordered a new

trial because he was of the view that the evidence did not show that such injury and resulting death were caused by any negligence on the part of the defendant; and that as the case stood "the defendant is entitled to an order for judgment notwithstanding the verdict"; but the trial court declined to order judgment notwithstanding the verdict because, he said, "there is a possibility on a new trial the plaintiff may be able to furnish the necessary evidence that at the time of the collision the train was running ahead of time and that such negligence was the proximate cause of the collision and injury, and the complaint can then be amended, specifically charging negligence on such ground."

There is little or no dispute or conflict in the evidence. The testimony shows without dispute that the decedent Cunningham, on October 6, 1941, made a trip from Devils Lake to a station more than thirty miles west. He traveled by speeder. On his way west be stopped at Churchs Ferry. The station agent at Churchs Ferry testified that Cunningham called there about 1:05 p. m., and obtained a train "line-up," (a message or statement transmitted from time to time each day by the dispatcher as to the location of trains, and showing whether the several trains are on time, if any train is late, and if so how late). The evidence shows that the company had promulgated rules and instructions for its telegraph and telephone employees, and that such rules and instructions were printed in form of a booklet and furnished to the employees. The first rule in the book of rules provided:

"Employees whose duties are prescribed by these rules must provide themselves with a copy.

Employees whose duties are in any way affected by the time-table must have a copy of the current time-table with them on duty."

Another following rule provided that the employees:

"Must expect trains to run at any time, on any track, in either direction."

Another rule provided that "the employees must, when possible, obtain a "line-up from the train dispatcher" before occupying the main track at the start of each day's work. Additional line-ups will be obtained throughout the day as needed." Another rule provided that where view is obstructed by weather conditions employees in charge of a track car must take the necessary precautions to prevent accidents.

Another rule or instruction provided: "do not attempt to rescue your car at risk of your own safety."

The evidence shows that the decedent Cunningham on the day of the accident had in his possession such book of rules, a copy of the current time-table (showing among others, the scheduled time of Train No. 4), and a train "line-up" which he had received from the station agent at Churchs Ferry.

The evidence also shows that the decedent had been working for the company for a long time; that he was travelling over the line continually and that he necessarily must have been familiar with the running time of Train No. 4.

The station agent at Churchs Ferry testified that Cunningham stopped at that station on his return to Devils Lake about 5:00 o'clock p. m. or a little later, that Cunningham made some remark but that he did not recall what Cunningham said or what, if any, reply he (the station agent) made thereto. So far as the evidence in the case shows that is the last time anyone saw Cunningham alive.

The train which collided with the speeder on which Cunningham was riding was a first class east-bound passenger train known as Train No. 4. The engineer, fireman, and conductor on the train were called as witnesses. One Pinkerton, the train master of that division, was also called as a witness. According to the undisputed testimony the train left Minot, a station some 118 miles west of Devils Lake, on the time scheduled in the time table, namely, at 2:45 p. m., and the train ran on schedule time all the way. Pinkerton, the train master, boarded the train at Rugby, a station some 37 miles west of Devils Lake, and he rode on the train from that point until the collision occurred. He testified that it was his duty to check up on the operation of the trains; to see whether they were being properly operated and whether there were any violations of the rules; that it was part of his duties to observe whether the train was operated on schedule time, and that he would take out his watch at each station, or whenever the train stopped, for the purpose of checking the operation of the train. The time table (a copy of which the decedent had) shows that Train No. 4 was scheduled for a stop at Churchs Ferry, a station 18.95 miles west of Devils Lake, at 5:39 p. m., for a stop at Penn, a station 5.97 miles east of

Churchs Ferry, at 5:48 p. m., and subject to being flagged at Grand Harbor, a station 5.88 miles east of Penn, at 5:56 p. m. The next station is Devils Lake, some 7.10 miles east of Grand Harbor. According to the time table the train was due to depart from Devils Lake at 6:19 p. m. The time of the arrival is not shown. It is obvious, however, that ordinarily considerable time would elapse between the arrival and the departure, and the testimony shows that Train No. 4 stopped at Devils Lake for a considerable period of time,—that is from the time of arrival until the scheduled time of departure. The testimony of all the witnesses was to the effect that the train was being run on schedule time from Minot to the time of the collision. The testimony was also to the effect that it rained off and on during that afternoon and that at the time of the collision it was raining rather hard. The rain was coming from an easterly direction. The undisputed testimony shows that about 2.33 miles east of Grand Harbor there is a railroad crossing where the main line of the Great Northern is crossed by the Soo line. At this crossing there has been constructed what is known as a tower—a building in which there is installed a flagman, whose duty it is to give signals to the trains of the respective railroads and indicate whether the line is open or whether the line is closed because a train on the other line has the right-of-way. Two and eighty-nine hundredths miles east of this tower or railroad crossing is what is known as the west switch, and this switch is 1.85 miles west of the passenger depot at Devils Lake. The collision took place about 30 or 33 feet east of such west switch. Under applicable regulations no train may operate at a speed in excess of 30 miles per hour over the railroad crossing. The engineer testified that his locomotive was equipped with a speedometer placed directly in front of where he was sitting and that he watched the speedometer. He testified that the train did not stop in Grand Harbor and that he passed through there at a speed of between 50 and 55 miles per hour but that before reaching the railroad crossing he slowed the train down to a speed not to exceed 30 miles per hour; that after the train had passed the crossing he accelerated the speed to about 45 miles per hour, and that at the time of the collision the train was running at about 45 miles per hour. The conductor and road master also gave it as their opinion that the train

was operating at about 45 miles per hour. All the witnesses to whom inquiry was directed testified positively that the train was not operating at a speed as high as 60 miles per hour, and that they could and would readily have observed if it had been operating at anything approaching such high speed. The engineer also testified that it would not have been possible to stop the train in the distance in which he did stop, if the train had been operating at 60 miles per hour or had been operated at a speed substantially in excess of 45 miles per hour. This testimony is corroborated by another witness, one Towne, a traveling engineer. Only one witness was asked any questions as to the time the collision occurred. This was the train master Pinkerton. He testified that after the emergency brake had been applied and before the stop was fully completed he got out of his seat and looked at his watch before he left the car, and that the time was 6:03½ p. m. There was offered in evidence the report of the railway company to the Public Service Commission of North Dakota concerning the accident. There was also offered in evidence telegrams sent by the engineer, the conductor, and the train master. There was also offered in evidence the original written reports of the accident made by the engineer and the fireman. The telegrams from the engineer and conductor read in part as follows: "No. 4 engine 2513 at 6:01 p.m. Near west switch at Devils Lake yard struck motor car with lineman Cunningham. Lineman apparently dead. Motor car broken up." . . . "Train speed about 45 miles per hour. Train master Pinkerton took charge."

The telegram from the train master read in part as follows: "At 6:03 p.m. No. 4 Eng. 2513 Condr Frank Engr Stevenson struck motor car operated by W. B. Cunningham lineman who was instantly killed."

In the report of the personal injuries transmitted to the company and signed by the engineer and the fireman it is stated that the accident occurred at 6:03 p. m. and that at the time the train was running at a speed of forty-five miles per hour.

The report of the accident filed by the railway company with the Public Service Commission of North Dakota was made on a printed blank in which spaces were provided for writing in answers to certain questions. Among others, the blank provided for a statement as to the date and the time of day of the accident and the speed of the train

involved. In such report it is stated that the accident occurred on October 6, 1941 at 6:03 p. m., that the train was going in an easterly direction at a speed of 45 miles per hour. The last question on the blank asks: "Detail of cause, nature, and circumstances of accident; responsibility and experience of employees responsible; estimate and description of damage to railway property."

To this question the following answer was given: "Lineman, traveling on motor car ahead of train No. 4, apparently did not realize speed of the train which was 60 miles per hour and was in the act of lifting his motor car into clear on the lead in Devils Lake yard when motor car was struck and completely demolished and instantly killing Lineman Cunningham. It was raining at the time and the visibility was poor so that engineer did not see him in time to stop. The Headlight on engine was burning brightly at the time."

One Swam, clerk in the train master's office, was called as a witness. He testified that he prepared the report of the accident which was filed with the Public Service Commission; that at the time he prepared the report he had before him as a basis for the answers given therein only the telegrams from the engineer and conductor and the written reports of the accident that had been submitted by the engineer and fireman; that he had no information as to the speed of the train at the time of the collision except the statements in such telegrams and reports,—all of which were to the effect that the train was operating at a speed of 45 miles per hour. Swam testified that the reference in the answer to the last question to the speed of 60 miles per hour related to the maximum speed allowable under the regulations of the company going west from the tower at the railroad crossing, and did not have reference to the speed of the train at the time of the accident. He said: "What I meant to infer was that possibly Mr. Cunningham didn't know the speed of the train but that it was permissible for the train to run sixty miles an hour thru that territory. The report itself, I think it is question 21, shows forty-five miles an hour at the time of the accident."

Train No. 4 was a first class passenger train and had the right-of-way over all motor cars and over all trains except passenger trains going west. There is no evidence to show that the train crew, or any of them, violated any of the rules or regulations of the company. The

undisputed evidence shows that there were four different crossings be-
tween the tower or railway crossing and the place of the collision, and
that the speeder could have been removed from the track at any of
those places. The undisputed evidence shows that the brakes of the
locomotive were in good working order; that both the fireman and the
engineer kept a lookout ahead; that the engineer had a speedometer di-
rectly in front of him, and that he observed the same; that the fireman
or engineer blew the whistle, by giving two long and one short and an-
other long blast, at each of the four highway crossings between the
tower and the place of collision; that the bell on the locomotive was put
into operation and rang continuously and automatically from the tower
or railway crossing and was ringing at the time of the accident, and
that the headlights on the locomotive were burning from the time the
train left Churchs Ferry until the time of the accident.

In the memorandum opinion filed by the trial court in ruling on the
motion for judgment notwithstanding the verdict or for a new trial,
the court expressed the view that the evidence failed to establish that
the train was operating at an excessive rate of speed; that it was run-
ning ahead of schedule, or that the decedent was discovered in a posi-
tion of peril and that the employees of the defendant by exercise of
due care might have obviated the accident and injury. The court
said:

"There is no evidence whatever in the case that the defendant ran
its train ahead of time or ahead of schedule at the time of the col-
lision."

"The undisputed evidence in the case conclusively shows that as
soon as the speeder was discovered, that emergency brakes were im-
mediately applied, and that the engineer did all in his power to avoid
the collision, and that a good stop was made."

"I am of the opinion, in this case, that no evidence has been intro-
duced in this case, showing any negligence on the part of the defendant
on which a verdict could be rendered against them and am satisfied
that the verdict rendered by the Jury was arrived at from sympathy,
bias, prejudice and passion, and not by reason of any facts in the case
showing any negligence on the part of the defendant."

"It seems to me, that the collision or accident occurred by reason of

the negligence of the deceased and that the negligence of the deceased Cunningham was the proximate cause of the injury, collision and his death."

We agree with these observations of the trial court. As said, the charge of negligence in this case is predicated upon three grounds: 1. That the train was operated at an excessive speed; 2. That the train was being run ahead of schedule time; and 3. That the defendant had knowledge that the decedent Cunningham was on the track and took no proper precaution to prevent his being injured.

It will be noted from the evidence that has been related above that all the testimony, both oral and documentary, was to the effect that at the time of the collision the train was being operated at a rate of speed of about 45 miles per hour. However, plaintiff's counsel argues that the recital in the report of the accident that was filed with the Public Service Commission tends to show that the train was being operated at the speed of 60 miles per hour. This contention is we think untenable. In such report there was a specific inquiry as to the rate of speed, and the rate was stated to be 45 miles per hour. The reference to a rate of speed of 60 miles per hour was in answer to a question that asked for a "detail of the cause, nature, and circumstances of the accident, the responsibility and experience of the employees responsible, and an estimate and description of damage to railway property."

Earlier in the report the specific question had been asked as to the rate of speed of the train at the time of the collision and that had been answered by stating that such speed was 45 miles per hour. The time table which had been received in evidence was referred to in the examination of Swam (the clerk who prepared the report filed with the Public Service Commission) and attention was called to a notation on such time table to the effect that the maximum speed of passenger trains from the tower westward was 60 miles per hour. As has been noted the testimony of Swam was to the effect that he had no knowledge as to the rate of speed at which the train was being operated except such as he gained from the telegrams of the engineer and conductor and from the written reports of the engineer and fireman, and that his answers to the questions in the report were based solely upon the information contained in such telegrams and reports; and these

documents all stated that the rate of speed of the train at the time of the collision was 45 miles per hour.

Plaintiff's counsel contends, however, that there was other evidence tending to show that the train was being operated at an excessive rate of speed and was also being run ahead of schedule time. Such contention is based on the following premise: According to the time table Train No. 4 was subject to be stopped at Grand Harbor by flagging. The time given in the time table for departure from Grand Harbor is 5:56 p. m. Grand Harbor is 5.22 miles west of the point where the collision occurred. Counsel argues that there was evidence from which the jury might find that the collision occurred at 6:01 p. m. and that consequently if the train left Grand Harbor at 5:56 p. m. it must have been running in excess of 60 miles per hour between Grand Harbor and the point of the collision and, hence, was being operated at an excessive rate of speed and was running ahead of schedule at the time of the collision. We have already set forth the evidence at some length. As said, there was only one witness who testified as to the time the collision occurred, namely, the train master Pinkerton. He stated that he had been checking on the running of the train from the time he boarded it; and, that in so doing, he looked at his watch and checked the arrival and the departure of the train at the various stations at which stops were made; that this was done in performance of his duty as train master; that it was also his duty to make a similar check as to any other unusual stop. He testified that at the time of the collision he looked at his watch before the stop had been completed and that his watch showed the time to be 6:03½ p. m. There was introduced in evidence the original telegram which the train master Pinkerton sent to the district superintendent at 7:45 p. m. that evening in which Pinkerton stated that the collision occurred at 6:03 p. m. It is true the engineer and conductor sent telegrams that same evening stating that the collision occurred at 6:01 p. m. However, in the written report which the engineer and fireman made of the accident upon the blanks provided by the company for the purpose of making such report they stated that the accident occurred about 6:03 p. m. Neither the engineer, the fireman or the conductor gave any testimony upon the trial as to the time the collision occurred. There was no scheduled

time for the train except at the different stations. In the very nature of things, the time Train No. 4 would pass the point where the collision occurred would vary somewhat dependent upon whether it was required to stop at Grand Harbor.

There is no claim and no proof that the defendant or its employees violated any statutory or municipal regulations in the operation of the train. There is no claim that there was any reason for anticipating that any persons other than those who might be there in performance of work incidental to the maintenance and operation of the railway would be likely to be on the railway premises at the point of collision, or on the railway adjacent thereto in either direction. Photographs of the railway tracks and the lands adjacent thereto at the point of collision and for considerable distances on each side of the point of collision were received in evidence, and such photographs show a condition which negative the probability that persons, by custom or otherwise, used the railway or premises immediately adjacent thereto for purposes of passage. There are no crossings of any kind and no paths. In short, everything indicates that at the point of collision and for considerable distances on each side the railway property was being used solely for the operation of railway traffic.

Plaintiff cites the decision of the Supreme Court of the United States in Santa Fe P. R. Co. v. Holmes, 202 US 438, 50 L ed 1094, 26 S Ct 676, in support of the contention that the defendant was negligent in running the train ahead of schedule. The case cited involved a wholly different state of facts. In that case there was a head-on collision between two trains. One of the trains did not comply with orders of the train dispatcher, and passed a station six minutes ahead of the schedule time, as fixed by special orders from the train dispatcher, and as a result the collision occurred. It would not have occurred if the orders had been obeyed. Obviously that decision has no bearing upon the questions involved here. In our view the evidence does not establish a state of facts from which reasonable and fair-minded men in the exercise of reason and judgment can find that at the time of the collision the train was being operated at an excessive rate of speed or that the train was being run ahead of schedule time.

As to the third charge of negligence, namely, that the defendant had

knowledge that the decedent Cunningham was on the track and took no proper precaution to prevent his being injured, we think there is an absence of any substantial proof tending to establish such charge. It is true the station agent at Churchs Ferry knew that the decedent, about 5:00 o'clock p. m. or a little later, departed from Churchs Ferry for Devils Lake; but he also knew that the decedent had been traveling the line for more than twenty years in the performance of the same type of work in which he was then engaged, and that he was fully conversant with the schedules of the trains and had, that very day, obtained a "line-up" of the trains. Certainly there was no breach of duty toward the decedent because the station agent did not inform the train crew of Train No. 4 that a lineman had left for Devils Lake on a speeder about 5:00 o'clock or a little later. So far as the evidence shows the train was not being operated with less than the care usually and ordinarily exercised, or in any manner other than it was ordinarily and usually operated over the same portion of the railway under similar conditions. The accident did not occur on account of any failure of the train crew to exercise due care.

It is, also, argued that the flagman in the tower at the railway crossing should have given warning to the train crew of the decedent's presence upon the track. It seems clear that this was not a matter for the flagman. His duty related solely to the giving of signals so far as they affected trains or motor cars at the crossing. That is, it was his duty to indicate by appropriate signals on which of the two lines of railway approaching trains or motor cars did or did not have the right-of-way. The testimony shows that he had no duty to perform in the way of giving signals with respect to trains or motor cars running on the same railway.

Plaintiff's counsel, also, argues that Cunningham, when he stopped at the depot at Churchs Ferry on returning to Devils Lake, "undoubtedly inquired as to whether the train was on time or not," and that he "got such information that he thought it was safe to proceed on to Devils Lake ahead of the train." The sum of the argument is that under the evidence the jury could have found that Cunningham was misinformed by the station agent at Churchs Ferry; and that such agent told him that train No. 4 was running behind time to such an

extent that he (Cunningham) would have adequate time to get to Devils Lake ahead of the train. The argument is unsound.

The undisputed evidence shows that train No. 4 at no time was running behind schedule time on the day in controversy. There is no evidence that the agent gave Cunningham any information as to the running time of the train; but if it be assumed that Cunningham sought and the agent gave such information, the presumption would be that the agent told the truth, that would be the natural and reasonable thing for him to do. There was no reason why he should have told a falsehood, or given misinformation. The law presumes in favor of integrity of conduct; absent proof to the contrary, there is a presumption that men act fairly and honestly. 20 Am Jur 223, Evidence. See also Comp. Laws 1913, § 7936, subds 19, 20.

Plaintiff's counsel cites the recent decisions of the Supreme Court of the United States in Tiller v. Atlantic Coast Line R. Co. 318 US 54, 87 L ed 610, 63 S Ct 444, 143 ALR 967; Bailey v. Central Vermont R. Co. 319 US 350, 87 L ed 1444, 63 S Ct 1062; and Owens v. Union P. R. Co. 319 US 715, 87 L ed 1683, 16 S Ct 1271, 15 NCCA (NS) 618. It is, in effect, contended that these decisions operate to enlarge the scope of, and to give greater and more conclusive effect to, the verdict of a jury on questions of negligence; and to correspondingly restrict the power of the court to direct a verdict in favor of the defendant, in actions arising under the Federal Employers' Liability Act.

We are not concerned with the construction which the court put upon the facts in these cases; but we are concerned with the rules of law as therein announced and applied; for in actions under the Federal Employers' Liability Act, wherever brought, the rights and obligations of the parties depend upon such Act and applicable principles of common law as interpreted and applied in the Federal Courts. Chesapeake & O. R. Co. v. Kuhn, 284 US 44, 76 L ed 157, 52 S Ct 45; Bailey v. Central Vermont R. Co. 319 US 350, 87 L ed 1444, 63 S Ct 1062, supra. Leaving wholly on one side all question as to the interpretation and construction of the evidence in the decisions cited, and, also, the question whether the court did or did not "strain the law of negligence to accord compensation where the employer is without

fault" (319 US 358, 87 L ed 1450, 63 S Ct 1062), such decisions recognize that the employer can be held liable only for negligence,—that is, that the employer can be held liable only for a breach of duty to his employee; and that in order to justify a verdict against an employer, there must be evidence from which fair-minded men in the exercise of reason and judgment may reach the conclusion that the employee sustained injury because of the negligence of the employer.

In the majority opinion in Tiller v. Atlantic Coast Line R. Co. 318 US 54, 87 L ed 610, 63 S Ct 444, 143 ALR 967, supra, it was said: "Many years ago this Court said of the problems of negligence, 'We see no reason, so long as the jury system is the law of the land, and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as these as well as others.' Jones v. East Tennessee, V. & G. R. Co. 128 US 443, 445, 32 L ed 478, 479, 9 S Ct 118. Or as we have put it on another occasion, 'Where the facts are in dispute, and the evidence in relation to them is that from which fair-minded men may draw different inferences,' the case should go to the jury." 318 US 67, 68, 87 L ed 618, 63 S Ct 444, 143 ALR 967. In Bailey v. Central Vermont R. Co. 319 US 350, 87 L ed 1444, 63 S Ct 1062, supra, the majority opinion, holding that the question of negligence should have been left to the jury, was predicated upon the proposition that the proof on that issue was of such debatable quality "that fair-minded men might reach different conclusions" as to the existence of the negligence charged.

The rules thus announced by the Supreme Court of the United States are precisely the same as those which have prevailed in this State throughout its entire history. Heckman v. Evenson, 7 ND 173, 73 NW 427; Owen v. Cook, 9 ND 134, 81 NW 285, 47 LRA 646; Carr v. Minneapolis, St. P. & S. Ste. M. R. Co. 16 ND 217, 112 NW 972; Ferm v. Great Northern R. Co. 53 ND 543, 207 NW 39; Bratvold v. Lalum, 68 ND 534, 282 NW 514; Schnell v. Northern P. R. Co. 71 ND 369, 1 NW(2d) 56. But the very statement,—" 'Where the facts are in dispute, and the evidence in relation to them is that from which fair-minded men may draw different inferences,' the case should go to the jury," implies that as a basis for a verdict by a jury there must be evidence "from which fair-minded men" in the

exercise of reason and judgment may find that the defendant was negli-· gent; and it follows as a necessary corollary that where there is no such evidence, and the state of the evidence is such that fair-minded men in the exercise of reason and judgment can reach only one conclusion the question becomes one of law to be determined by the court. Owen v. Cook, 9 ND 134, 81 NW 285, 47 LRA 646; Fern v. Great Northern R. Co. 68 ND 534, 282 NW 514; Bratvold v. Lalum, 68 ND 534, 282 NW 514, and Schnell v. Northern P. R. Co. 71 ND 369, 1 NW(2d) 56, all supra. A verdict for damages must have support in the evidence, it cannot be based upon mere conjecture, surmise or speculation. Scherer v. Schlaberg, 18 ND 421, 122 NW 1000, 24 LRA(NS) 520; Garraghty v. Hartstein, 26 ND 148, 143 NW 390; State Bank v. Bismarck Elevator & Invest. Co. 31 ND 102, 153 NW 459; Bowers v. Great Northern R. Co. 65 ND 384, 259 NW 99, 99 ALR 1443. This is equally true in an action under the Federal Employers' Liability Act. Chicago, M. & St. P. R. Co. v. Coogan, 271 US 472, 70 L ed 1041, 46 S Ct 564; Northwestern P. R. Co. v. Bobo, 290 US 499, 78 L ed 462, 54 S Ct 263. "The negligence complained of must be the cause of the injury. The jury may not be permitted to speculate as to its cause and the case must be withdrawn from its consideration unless there is evidence from which the inference may reasonably be drawn that the injury . . . was caused by the negligent act of the employer." 290 US 502, 503, 78 L ed 465, 54 S Ct 263.

It is regrettable that a person in hazardous employment such as that in which the decedent was engaged has not been brought within the operation and protection of Workmen's Compensation legislation so as to be entitled to compensation for injuries (not willfully self-inflicted) received in course of his employment regardless of questions of fault (Laws of North Dakota 1919, c 162; 71 CJ pp 242 et seq); but the law makers have made no such provision. And, as pointed out, the basis of recovery under the Federal Employers' Liability Act is negligence. Without negligence there is no right of action. Chesapeake & O. R. Co. v. Stapleton, 279 US 587, 73 L ed 861, 49 S Ct 442. In an action under the Federal Employers' Liability Act the burden is upon the plaintiff to prove that the accident was proximately due to the negligence of the employer. New York C. R. Co. v. Ambrose, 280

US 486, 74 L ed 562, 50 S Ct 198. "The fact of accident carries with it no presumption of negligence on the part of the employer." New York C. R. Co. v. Ambrose, supra; 35 Am Jur p 822. The fact of negligence must be established by evidence of such character that fair-minded men in the exercise of reason and judgment may draw the inference therefrom that the employer was negligent, and that such negligence was the proximate cause of the injury sustained by the employee. Chicago, M. & St. P. R. Co. v. Coogan, 271 US 472, 70 L ed 1041, 46 S Ct 564, supra; Northwestern P. R. Co. v. Bobo, 290 US 499, 78 L ed 462, 54 S Ct 263, supra. A recovery against the employer is not warranted where the question of defendant's negligence is left in the realm of surmise, speculation or conjecture. Chicago, M. & St. P. R. Co. v. Coogan, supra.

In this case there is no evidence from which the inference may reasonably be drawn that the injuries which caused the death of Cunningham were occasioned by the negligence of the defendant. The proximate cause of such injuries was not the failure of the defendant or its employees to perform some duty owed to the decedent; the proximate cause of such injuries was the acts of the decedent himself. The trial court was correct in the view that under the evidence the defendant was entitled to have a verdict directed in its favor. Upon the record as a whole the defendant is entitled to judgment as a matter of law. The order appealed from is reversed and the cause is remanded with directions that judgment be rendered dismissing the action.

MORRIS, Ch. J., and BURKE, NUESSLE and BURR, JJ., concur.