Mary ANDREWS and Mark Andrews,
Plaintiffs and Appellants,

v.

J.W. O'HEARN, M.D., S. Thompson, M.D.,
Fargo Clinic, St. Luke's Hospitals,
Ryan B. Harrington, M.D., The Neuro-
logic Associates, Dale R. Shook, M.D.,
Roger L. Gilbertson, M.D., Radiologists,
Ltd., and Does 1 through 50, inclusive,
including each and every number be-
tween 1 and 50, inclusive, Defendants
and Appellees.

Civ. No. 10837.

Supreme Court of North Dakota.

May 7, 1986.

David M. Harney (argued), and Frederick C. Shaller, of Harney, Wolfe, Pagliuso, Shaller & Carr, Los Angeles, Cal., David M. Axelrad (argued), and Barry R. Levy, of Horvitz, Levy & Amerian, Encino, Cal., and Robert Vogel (argued), of Robert Vogel Law Office, P.C., Grand Forks, for plaintiffs and appellants.

John D. Kelly (argued), Jane C. Heinley, and Harlan G. Fuglesten, of Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, for defendants and appellees J.W. O'Hearn, M.D., S. Thompson, M.D., and Fargo Clinic.

Jack G. Marcil (argued), and Paul F. Richard, of Serkland, Lundberg, Erickson, Marcil & McLean, Ltd., Fargo, for defendant and appellee St. Luke's Hospitals.

Patrick J. Maddock (argued), and Gerald J. Haga, of Degnan, McElroy, Lamb, Camrud, Maddock & Olson, Ltd., Grand Forks, for defendants and appellees Ryan B. Harrington, M.D., and The Neurologic Associates.

Gunder Gunhus (argued), and Kate MacEachern, of Gunhus, Grinnell, Klinger, Swenson & Guy, Moorhead, Minnesota, for defendants and appellees Dale R. Shook, M.D., Roger L. Gilbertson, M.D., and Radiologists, Ltd.

VANDE WALLE, Justice.

Mary and Mark Andrews (plaintiffs) appealed from the judgment of the district court of Cass County dismissing their complaint, the order denying their motion for a new trial and for judgment notwithstanding the verdict, and the order denying costs in their favor and granting taxation of costs against them. We affirm.

This suit involves various allegations of medical malpractice against Drs. O'Hearn, Thompson, Harrington, Shook, and Gilbert-son, Fargo Clinic, St. Luke's Hospitals, The Neurologic Associates, and Radiologists, Ltd. (defendants).[1] Following a nine-week trial, the jury found O'Hearn, Harrington, and St. Luke's Hospitals negligent; the jury did not, however, find proximate cause between the acts of the negligent defendants and the injuries to the plaintiffs and therefore awarded no damages. On appeal, the plaintiffs raise as issues:

(1) that the trial court erroneously refused to consider juror affidavits that allegedly demonstrate the jury's use of an erroneous definition of proximate cause;

(2) that communications with the jury by the bailiff and judge without notice and outside the presence of counsel constituted prejudicial error;

(3) that the court's instruction on proximate cause was incorrect;

(4) that the court's instruction on presumption of truth was improper;

(5) that defense counsel committed misconduct during closing arguments;

(6) that the jury's finding of negligence against O'Hearn, Harrington, and St. Luke's Hospitals compels a finding of proximate cause and liability for damages;

(7) that the jury erred as a matter of law in absolving Fargo Clinic and The Neurologic Associates of negligence; and

(8) that the trial court erred by awarding costs and disbursements to defendants and denying costs to plaintiffs.

I

## JUROR AFFIDAVITS

Plaintiffs allege that the jurors disregarded the court's instruction on proximate cause and instead relied on their own improper definition of proximate cause. In support of this proposition, plaintiffs submitted six juror affidavits to the trial court.

---

1. A claim of fraud was dismissed by the trial court during the trial. Plaintiffs do not appeal from this dismissal.

The trial court refused to consider the affidavits, holding that affidavits of jurors are not admissible to impeach the jury's verdict except to show juror misconduct based upon extraneous prejudicial information, outside influence, or a chance verdict. This is a correct statement of the long-standing rule in North Dakota. Rule 606(b), N.D.R. Ev.; Rule 59(b)(2), N.D.R.Civ.P.; *Mauch v. Manufacturers Sales & Service, Inc.*, 345 N.W.2d 338 (N.D.1984); *James Turner & Sons v. Great Northern Railway Co.*, 67 N.D. 347, 272 N.W. 489 (1937). Juror affidavits may not be used "for purposes of impeaching a verdict relative to the mental processes or reasoning of the jurors in arriving at a decision." *Mauch*, 345 N.W.2d at 343. An attempt to use juror affidavits to demonstrate how the jury arrived at its decision falls precisely within the confines of the rule prohibiting impeachment of the jury verdict.

Plaintiffs nonetheless argue that our rule should be abandoned because it prevents the correction of an injustice and denies the plaintiffs due process of law.[2] We have for many years extolled the importance of our public policy, which is codified in our rules, that prevents examination of the mental processes of jury deliberations. One of plaintiffs' counsel stated in oral argument that the future of the jury system in our State depends upon our determination of the appropriate response to alleged jury misconduct in its deliberations. We agree with counsel's statement, but reach a result contrary to his position. Were we to allow examination of the jury's internal deliberations, as is proposed here, the jury system would suffer an unprecedented blow to its function and effectiveness. As we stated in *State v. Forrester*, 14 N.D. 335, 338, 103 N.W. 625, 626 (1905), consideration of juror affidavits to impeach a verdict would be a great detriment to the jury system:

"It would greatly tend to unsettle verdicts if a juror be permitted to say, after it is too late to be remedied, that he did not understand the charge of the court. *To do so would result in continual embarrassment and interminable controversy* after trials, although a verdict had been duly and solemnly announced. *It would subject jurors to constant annoyance by being called upon to state the occurrences of the jury room, which ought to be kept secret as well as privileged.* It would subject jurors to influences by corrupt parties in an effort to have them impair their verdict after they had ceased to act as jurors. *Although injustice may at times result* from thus holding verdicts solemnly rendered unassailable by affidavits of jurors as to their not understanding the charge or as to their reasons for agreements, *we deem it the better rule, and subject to less liability to injustice, that a verdict actually rendered shall be conclusively deemed to be a verdict, and beyond impeachment* by the declaration of a juror as to a mental condition existing when he agreed upon a verdict, or as to his reasons for so agreeing." [Emphasis added.][3]

---

2. Unfortunately, defendants did not respond to plaintiffs' due-process arguments based on the Fourteenth Amendment of the United States Constitution and Article I, Section 9, of the North Dakota Constitution.

3. See also the early Federal view on juror impeachment of a jury verdict as exhibited in *McDonald v. Pless*, 238 U.S. 264, 267–268, 35 S.Ct. 783, 784, 59 L.Ed. 1300, 1302 (1915):

"[T]he weight of authority is that a juror cannot impeach his own verdict. The rule is based upon controlling considerations of a public policy which in these cases chooses the lesser of two evils. When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of a motion for a new trial the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted to testify as to what happened in the jury room.

"... But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus se-

It is essential to our system of justice that the jury be unfettered in its discussions; the prospect of continued reexamination and subsequent justification of the jury verdict would create a substantial chilling effect upon the jurors and hinder free and open discussion. See, e.g., *McDonald v. Pless*, 238 U.S. 264, 267–268, 35 S.Ct. 783, 784, 59 L.Ed. 1300, 1302 (1915). Post-verdict examination of the content, method, and manner of the jury's internal decision-making process would "place every verdict at the mercy of jurors and invite tampering and harassment." Notes of Advisory Committee on Rule 606(b), F.R. Evid., citing *Grenz v. Werre*, 129 N.W.2d 681 (N.D.1964). As recently stated by the United States Supreme Court,

> "once the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment. Courts have always resisted inquiring into a jury's thought processes [citing *McDonald v. Pless* and Rule 606(b) ]; through this deference the jury brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality." *United States v. Powell*, —— U.S. ——, ——, 105 S.Ct. 471, 478, 83 L.Ed.2d 461, 470 (1984).

This admonition as to the sanctity of the jury's thought processes and the need for finality applies with even more force to civil litigation, where liberty interests are not involved.[4]

Plaintiffs contend that a jury's agreement to disregard the instructions is an objectively verifiable act properly subject to judicial review. Plaintiffs' argument that group decisions constitute objectively verifiable evidence of overt acts that can be admitted as evidence is contrary to North Dakota law and drawn from a misapplication of one sentence taken out of the context of our decision in *Kerzmann v. Rohweder*, 321 N.W.2d 84 (N.D.1982). In support of their view, the plaintiffs quoted only the italicized portion of the following quotation from *Kerzmann:*

> "Rule 606(b) sets forth the circumstances when a juror is competent as a witness when an inquiry is made into the verdict. The portion of Rule 606(b) which is relevant here permits a juror to testify as to 'whether extraneous prejudicial information was improperly brought to the jury's attention, [or] whether any outside influence was improperly brought to bear on any juror, ...' Rule 606(b). *These items are similar to the California rule that a juror may testify to overt acts, conduct, events, and statements that are objectively ascertainable.* [Citation omitted.] Rule 606(b) does not permit a juror to testify 'as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's

---

cured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference."
The present Federal law in this area is brought together at Annot., 65 A.L.R.Fed. 835 (1983 & Supp.1985) [competency of juror as witness, under F.R.Evid. 606(b), upon inquiry into validity of verdict or indictment].
Plaintiffs' misconstrue *McDonald* by quoting out of context from the case. Despite the holding of *McDonald,* the language quoted above, and the contrary statements of law immediately surrounding the quoted material, the plaintiffs selected only the following italicized language from *McDonald:*
"[T]he argument in favor of receiving such evidence is not only very strong, but unanswer-

able—when looked at solely from the standpoint of the private party who has been wronged by such conduct. The argument, however, has not been sufficiently convincing to induce legislatures generally to repeal or to modify the rule. For, while it may often exclude the only possible evidence of misconduct, a change in the rule 'would open the door to the most pernicious arts and tampering with jurors.' 'The practice would be replete with dangerous consequences.' 'It would lead to the grossest fraud and abuse' and 'no verdict would be safe.' [Citation omitted.]" *McDonald v. Pless, supra,* 238 U.S. at 268, 35 S.Ct. at 784–785, 59 L.Ed. at 1302.

4. The special regard afforded to loss of liberty is exhibited in *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

mind or emotions ...' Rule 606(b). These items are similar to the California rule that prohibits a juror from testifying to the subjective reasoning processes of the juror. [Citation omitted.]" 321 N.W.2d at 91.

■ Our reference to the similarity to the California rule, which is contained in a statute, does not mean that our rule is identical or is to be given similar interpretation. Indeed, the California statute is substantially different from our rule. Rule 606(b) of our Rules of Evidence [5] provides that:

> "*a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations* or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, *but a juror may testify on the questions whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the verdict of the jury was arrived at by chance.*" [Emphasis added.]

The California statute, on the other hand, allows admission of evidence "as to statements made, or conduct, conditions, or events occurring, *either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.*" Cal.Evid.Code § 1150(a) (West 1966). [Emphasis added.] Thus our rule provides a blanket prohibition as to any matter or statement occurring during the course of the jury's deliberations, and only extraneous matters or evidence of a quotient verdict may be admitted for the purpose of impeaching a jury verdict. The

California statute, however, allows evidence of anything likely to have influenced the verdict improperly, either within or without the jury room. The distinction is obvious: Our rule provides a prohibition of juror impeachment of verdicts with narrowly defined exceptions to that prohibition, while the California statute permits impeachment of verdicts whenever there is a likelihood that anything improperly influenced the verdict.

Not surprisingly, our interpretation of Rule 606(b) is decidedly different from the California courts' interpretation of their statute in that we have retained the distinction between extraneous information and internal aspects of jury deliberations, regardless of the potential of objectively ascertaining overt acts within the internal deliberations of the jury. The California decisions interpreting Section 1150 are exemplified by *In re Stankewitz,* 40 Cal.3d 391, 708 P.2d 1260, 220 Cal.Rptr. 382 (1985), and *People v. Hutchinson,* 71 Cal.2d 342, 455 P.2d 132, 78 Cal.Rptr. 196, *cert. denied,* 396 U.S. 994, 90 S.Ct. 491, 24 L.Ed.2d 457 (1969), in which the California Supreme Court has interpreted the statute to mean that

> "jurors are competent to prove 'objective facts' ... [and that] jurors may testify to 'overt acts'—that is, such statements, conduct, corditions, or events as are 'open to sight, hearing, and other senses and thus subject to corroboration'—but may not testify to 'the subjective reasoning processes of the individual juror....'
>
> "... Section 1150, subdivision (a), expressly allows proof of 'statements made ... either within or without the jury room....'" *Stankewitz,* 40 Cal.3d at 397–398, 708 P.2d at 1262–1263, 220 Cal. Rptr. at 384–385, citing *Hutchinson.*[6]

---

**5.** As stated in *Kerzmann v. Rohweder,* 321 N.W.2d 84, 91 (N.D.1982), our Rule 606(b) is based on the applicable Federal Rule of Evidence and must be considered in its relation to Rule 59, N.D.R.Civ.P.:

"Rule 606(b) was adopted virtually verbatim from the Federal Rules of Evidence, Rule 606(b). The Advisory Committee Notes to Rule 606(b), F.R.Evid., indicate that the 'rule

does not purport to specify the substantive grounds for setting aside verdicts for irregularity; it deals only with the competency of jurors to testify concerning those grounds.'"

**6.** The California decisions should be compared with our own decisions in this area, which do not employ an "objective facts" analysis. For example, in North Dakota juror affidavits have

Although this view may have allure, particularly in relation to a deliberate agreement to disregard the instructions, it must be rejected under Rule 606(b), which prohibits review of the internal deliberative processes of a jury. The strong policy considerations discussed above apply to all internal aspects of the jury's deliberations. In *James Turner & Sons, supra,* the court observed that the rule concerning overt acts

> "is that anything that is properly before the jury, which includes everything that was submitted, cannot be impeached because it all inheres in the verdict itself; but the jurors can testify or make affidavits stating the facts as to any outside interferences of any kind or of coercion by the court or bailiffs." 67 N.D. at 368, 272 N.W. at 499.

Our rules provide but one exception to the prohibition against the use of juror affidavits to impeach the internal deliberations of a jury, and that exception, concerning quotient verdicts, is specifically contained in Rule 606(b). The same policy reasons demand a strict interpretation of the rule. The fact that such conduct may be objectively verifiable misses the point. The essential fact is that agreements as to the interpretation of the instructions, like all other agreements reached during deliberations except those regarding a quotient verdict, are barred from review under Rule 606(b). The trial court therefore properly refused to consider the juror affidavits.

■ It is important to recognize, however, that our application and construction of Rule 606(b) does not mean that our system is incapable of correcting an injustice caused by internal misconduct of a jury. We note, in the words of a recent United States Supreme Court decision, that a litigant receiving an unfavorable verdict "is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." *Powell, supra,* — U.S. at ——, 105 S.Ct. at 478, 83 L.Ed.2d at 470 (1984). Thus, while protecting the internal workings of our juries, our procedural rules nonetheless allow a party to attack the verdict itself if it is not supported by the evidence. In this manner, the parties are guaranteed an opportunity to correct a jury mistake in relation to whether the evidence supports the final outcome. Under such a framework, it cannot be said that the application of Rule 606(b) violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Cf. *Powell, supra; Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *McDonald v. Pless, supra.* And, so long as our system provides such a method to correct jury error (thereby protecting the due-process rights of litigants), the greater weight of public policy demands that the internal deli-

not been allowed for impeachment of a verdict to show that the jury did not believe the defendant guilty of gross negligence but awarded damages against him anyway [*Grenz v. Werre,* 129 N.W.2d 681 (N.D.1964)]; to show that the jurors misunderstood the evidence [*Brauer v. James J. Igoe & Sons Construction, Inc.,* 186 N.W.2d 459 (N.D.1971)]; to show compromise on damages [*Christensen v. Farmers State Bank of Richardton,* 157 N.W.2d 352 (N.D.1968); *James Turner & Sons v. Great Northern Railway Co.,* 67 N.D. 347, 272 N.W. 489 (1937)]; to show juror confusion [*Kerzmann v. Rohweder, supra*]; or to show that the jury disregarded the instructions [*Mauch v. Manufacturers Sales & Service, Inc.,* 345 N.W.2d 338 (N.D.1984)]. As we stated in *Keyes v. Amundson,* 343 N.W.2d 78 (N.D.1983), it has long been the law in this State that a juror affidavit may not be used to prove facts which inhere in the verdict. 343 N.W.2d at 84, citing *James Turner & Sons v. Great*

*Northern Railway Co., supra* [where no conflict in evidence as to damages and the amount found by jury is grossly disportionate to the evidence, verdict indicated a compromise verdict]. Our decisions in this area demonstrate that except in matters concerning a quotient verdict (an exception that finds specific basis in the rule itself), our rule prohibits examination of the internal deliberations of a jury.

We also observe that the Federal courts' interpretation of Rule 606(b), which we employ as an aid in applying our similar rule [*State v. Manke,* 328 N.W.2d 799 (N.D.1982)], conform to our own view that juror affidavits should not be used to impeach a verdict, even where it is alleged that a juror misunderstood or disregarded the judge's instructions. See 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 606[04] at 606–28 to 606–29 n. 21 (1981), and cases cited therein.

berative processes of the jury remain inviolate.

Plaintiffs' final argument in regard to use of juror affidavits concerns an alleged violation of the North Dakota Constitution. Plaintiffs argue that "consideration of the affidavits should be required under the due process provision of the North Dakota Constitution," relying on Article I, Section 9, which provides that "every man for any injury done him in his lands, goods, person or reputation shall have remedy by due process of law, ..." [7] According to plaintiffs, Section 9 "provides a guarantee of justice to the individual civil litigant" and the "guarantee is unfulfilled where, as here, individual litigants are forced to suffer a clear miscarriage of justice."

■ Plaintiffs cite no North Dakota case in support of their construction of Article I, Section 9. Our research shows that the portion of Section 9 relied upon by the plaintiffs has been repeatedly construed as a guarantee of *access* to our State system of justice.[8] But, even if a more broad interpretation of this clause is warranted, Section 9 never has been construed as an absolute right; indeed, this court once stated that the provision must be interpreted in light of the "superior rights of the public and the necessities of the occasion." *Stockwell v. Crawford*, 21 N.D. 261, 266, 130 N.W. 225, 228 (1911).[9] The non-absolute character of Section 9 is readily appar-

ent by a review of this court's decisions interpreting that section as not requiring a remedy for every alleged wrong.[10] And, although this court has, on occasion, used this provision of the North Dakota Constitution to correct a substantive error,[11] we do not believe that Section 9 was intended to promote this court to the position of a super-legislature in charge of ensuring perfect justice and complete remedies, thereby supplanting the traditional function of the jury, the standards employed to evaluate a jury decision, and the rules of evidence, such as Rule 606(b), that protect jury independence by preventing judicial overseeing of the internal workings of the jury. Although there may be occasions where this State constitutional provision is properly employed to protect a litigant against a deprivation of due process, to avert a harsh result that is otherwise inevitable, or to prevent the destruction of the only opportunity for an appropriate remedy, we do not believe that such a situation exists here.

## II

## JURY COMMUNICATIONS

Plaintiffs next argue that communications with the jury during its deliberations by the bailiff and trial court, without notice to and outside the presence of counsel, constituted prejudicial error. According to

7. Section 9 of Article I was originally Section 22 of the 1889 North Dakota Constitution. The constitutional provisions were rearranged and renumbered in 1980 pursuant to Section 46–03–11.1, N.D.C.C.

8. See, e.g., *Malin v. LaMoure County*, 27 N.D. 140, 145 N.W. 582 (1914); *KFGO Radio, Inc. v. Rothe*, 298 N.W.2d 505 (N.D.1980).

9. See also *Three Affiliated Tribes v. Wold Engineering*, 364 N.W.2d 98 (N.D.1985), *cert. granted*, —— U.S. ——, 106 S.Ct. 270, 88 L.Ed.2d 224 (1985).

10. See *In Interest of W.M.V.*, 268 N.W.2d 781 (N.D.1978); *Ferch v. Housing Authority of Cass County*, 79 N.D. 764, 59 N.W.2d 849 (1953); *Northern Pac. Ry. Co. v. State*, 71 N.D. 93, 299 N.W. 696 (1941); *Ethen v. North Dakota Workmen's Compensation Bureau*, 62 N.D. 394, 244

N.W. 32 (1932); *Crandall v. North Dakota Workmen's Compensation Bureau*, 53 N.D. 636, 207 N.W. 551 (1926); *Neer v. State Live Stock Sanitary Board*, 40 N.D. 340, 168 N.W. 601 (1918); *State v. Frazier*, 39 N.D. 430, 167 N.W. 510 (1918).

11. See *Arneson v. Olson*, 270 N.W.2d 125 (N.D.1978); *Vermillion v. Spotted Elk*, 85 N.W.2d 432 (N.D.1957); *Northern Pacific Railway Co. v. City of Grand Forks*, 73 N.W.2d 348 (N.D.1955); *Divide County v. Baird*, 55 N.D. 45, 212 N.W. 236 (1927); *State v. Watland*, 51 N.D. 710, 201 N.W. 680 (1924); *Meyerle v. Pioneer Pub. Co.*, 45 N.D. 568, 178 N.W. 792 (1920); *Trustee Loan Co. v. Botz*, 37 N.D. 230, 164 N.W. 14 (1917). See also *Nelson v. Dubois*, 232 N.W.2d 54 (N.D.1975) (Vogel, J., dissenting); *Tuttle v. Tuttle*, 48 N.D. 10, 181 N.W. 898 (1921) (Grace, J., dissenting); *State v. Bennett*, 37 N.D. 465, 163 N.W. 1063 (1917) (Robinson, J., dissenting).

the affidavits submitted to the trial court,[12] a bailiff denied the foreman's request for a dictionary "because it was not in evidence." The bailiff informed the foreman that "if they had a request they should write it out in a note and [he] would give the note to the judge, who would have to call all the attorneys together before providing any additional information." The foreman "then said to 'forget about it.'" The bailiff transmitted the jury's request to the judge "in an unrecorded conversation." At the end of the day's deliberations, the judge gave a supplemental jury instruction:

> "Do not use any extraneous evidence; in other words, do not avail yourselves of dictionaries or encyclopedias or anything that may be available to you at your home."

This instruction was given in open court, but without notice to or the presence of counsel.

■ We agree that the bailiff erred in informing the jurors that they could not receive a dictionary. Obviously a bailiff may communicate with the jury regarding administrative matters. But a bailiff's role does not include discussing any matters concerning the substantive law or the procedural rules, even if the bailiff has years of experience and believes he knows what the judge's answer will be to a particular question. See Section 28–14–18, N.D.C.C.

■ Although the bailiff's comment to the jury that questions to the judge had to be put in writing was proper as an administrative function, his additional comments—that he would give the note to the judge, who "would have to call all the attorneys together before providing any additional information"—were beyond the scope of

his administrative function and therefore in error. See, e.g., *Demaray v. Ridl*, 249 N.W.2d 219 (N.D.1976). Such comments unnecessarily dampen proper jury communication with the judge, as can be seen by the foreman's immediate response.

According to *Ferderer v. Northern Pacific Ry. Co.*, 75 N.D. 139, 26 N.W.2d 236 (1947), once a party shows affirmatively from the record that error in communicating ex parte with the jury was committed which might operate to his injury, the burden is shifted to the prevailing party to show that the error was not prejudicial.[13] In the instant case the lower court found that there was no error, and, in the alternative, that any error was harmless. We have already concluded that the ex parte communications resulted in error. But we agree with the lower court's determination that the errors were harmless.

Plaintiffs contend that *Cendak Agri-Service, Inc. v. Hausman*, 275 N.W.2d 326 (N.D.1979), stands for the proposition that the harmless-error doctrine does not apply to the review of ex parte communications with the jury. This is incorrect. The court in *Cendak* determined that the error affected the substantial rights of the parties and therefore was not harmless. But a close reading of the case demonstrates that the court, in its form of analysis, applied the harmless-error standard. Thus the harmless-error doctrine applies in regard to ex parte communications with the jury. See also *State v. Hatch*, 346 N.W.2d 268 (N.D.1984) [harmless-error rule applied to ex parte communication with jury in criminal trial].

■ Each case must be decided upon its own facts in applying the harmless-er-

---

**12.** The affidavits are admissible here because they concern extraneous information. See Rule 606(b), N.D.R.Ev.; *James Turner & Sons v. Great Northern Railway Co., supra.*

**13.** We note that in the limited area of jury sequestration, some of our recent decisions place the burden of proving prejudice on the non-prevailing party. See *State v. Bonner*, 361 N.W.2d 605 (N.D.1985); *Keyes v. Amundson*, 343 N.W.2d 78 (N.D.1983); *State v. Bergeron*, 340 N.W.2d 51 (N.D.1983). But we do not view

these cases as superseding the long-standing rule, such as in *Ferderer*, that places the burden on the prevailing party to prove that the misconduct, due to juror misconduct or improper communications to the jury, was not prejudicial. See, e.g., *Basin Elec. Power Co-op v. Paulson*, 289 N.W.2d 548 (N.D.1980), citing *James Turner & Sons v. Great Northern Ry. Co.*, 67 N.D. 347, 272 N.W. 489 (1937). See also *State v. Abell*, 383 N.W.2d 810 (N.D.1986).

ror doctrine. Here, each of the two errors is harmless. The bailiff's refusal to provide the jury access to a dictionary is harmless because permitting the jury access to a dictionary during deliberations would have been error. See *State v. Abell,* 383 N.W.2d 810 (N.D.1986). And the bailiff's comments concerning the procedure to be followed subsequent to the submission of a note from the jury to the judge is harmless because the comments did not prevent the jury from submitting a question to the judge. The trial court had specifically instructed the jury as to the procedure to be employed in asking the court a question; the jury still had the opportunity to send a note and decided not to do so.[14] We emphasize, however, that although the bailiff's improper comments may have been factually correct, a bailiff never should provide advice as to any nonadministrative matter, such as occurred here. A bailiff should be strictly limited in his communications to the jury by express instructions from the trial judge. A bailiff's communications to the jury should entail merely ensuring that the physical needs and safety of the jury are attended to, asking if the jury has agreed upon a verdict or what the jury wants when summoned by the jury to the jury door, and informing the jury that its question or request must be put in writing. Any other communication, however slight, is error.

■ Plaintiffs contend that had they been notified of the dictionary request, they would have been able to ask that the trial court question the jurors and find out why they wanted a dictionary; and once the court allowed the questioning of the jury, counsel and the court would have perceived the difficulty and alleviated it.

The trial court, on the other hand, later ruled in its order denying a new trial that the jury could not have had a dictionary and that the court would not have allowed counsel to inquire as to the jury's reason for wanting a dictionary. Such actions are within the trial court's discretion. See, e.g., *Haugen v. Mid-State Aviation, Inc.,* 144 N.W.2d 692 (N.D.1966). We therefore conclude that there was no error in the trial court's refusal to allow the jury access to a dictionary or in the trial judge's policy of not asking the jurors why they wanted a dictionary.

■ The trial court's supplemental instruction admonishing the jury to not use any extraneous information such as a dictionary was merely a reiteration of previous jury instructions limiting the deliberations to the evidence. In addition, the instruction was merely administrative in nature in that it served as a reminder to the jurors, at the close of the day, to not expose themselves to extraneous information. The instruction, even without notice to the parties, was proper, although generally notice should be provided to the parties as a courtesy whenever supplemental instructions are given. See, for example, *Cendak, supra,* and *State v. Klein,* 200 N.W.2d 288 (N.D.1972), describing the proper method to be employed by the court when the jury has a question

Plaintiffs' final argument as to this issue is that the ex parte communications with the jury violated their Federal due-process rights.[15] According to the plaintiffs, the Due Process Clause of the United States Constitution, as applied to the States through the Fourteenth Amendment, requires the court to provide counsel and the

---

**14.** Another juror stated by affidavit that she was not aware that "jurors had the right to request the judge to explain the terms of the law to us when we were in doubt, as to the interpretation of legal questions or wording in jury instructions." This juror also stated that the jury asked the bailiff twice "if we could have the judge explain to us, questions we were in doubt about. The bailiff told us that we could not ask the judge any questions or [for] explanations." The affidavit is in direct opposition to the trial

court's instructions. See also our discussion as to the first two issues.

**15.** Plaintiffs' attempt to raise due-process considerations based on our State Constitution by the mere mention of the provision in a footnote is insufficient to raise the State constitutional issue before this court. See, e.g., *City of Bismarck v. Hoffner,* 379 N.W.2d 797 (N.D.1985). See also *State v. Jewett,* —— Vt. ——, 500 A.2d 233 (1985).

parties with notice and an opportunity to be heard at all stages of the trial, including any instance of communication with the jury during deliberation or any submission of supplemental instructions to the jury.

We recognize the general rule that communication with the jury during deliberation requires notice to counsel and an opportunity to object to the proposed response. See Section 28–14–19, N.D.C.C.; *Cendak, supra.* But the rule cannot be taken to absurd lengths, such as where the violation of the rule does not reach constitutional dimensions or in instances where the rule is not intended to apply. As mentioned above, several of the ex parte communications were improper. But the error produced by these communications was harmless and therefore does not rise to the level of a constitutional violation. Nor do we perceive constitutional error in the ex parte communications involving administrative concerns, such as the bailiff's statement that questions must be in writing, or the court's reiteration, by its supplemental instruction, that the verdict must be based strictly upon the evidence of the case and the rules of law as given to the jury through the instructions. We therefore conclude that the ex parte communications with the jury did not violate plaintiffs' Federal due-process rights.

### III

### PROXIMATE–CAUSE INSTRUCTION

Plaintiffs argue that the trial court improperly modified the instruction on proximate cause by inserting therein the concept of direct cause. Plaintiffs submitted the following requested instruction, but without the italicized material which the lower court added:

### "CAUSATION

"Before a person can be held responsible for the negligence as the basis of a claim of liability, his negligence must have been a proximate cause of the injury. *Proximate cause means direct cause.* A proximate cause is a cause which had a substantial part in bringing about the harm or injury either immediately or through happenings which follow one another.

"There may be more than one proximate cause of the injury. The negligence of two or more persons may contribute concurrently as proximate cause of injury, and in such case each of the participating acts or omissions constituting negligence is regarded in law as a proximate cause. This is true regardless of the fact that the conduct of the wrongdoer may have been more or less blameworthy than that of another.

"To constitute proximate cause, it must appear that the ultimate injury complained of was a natural and probable consequence of the negligence of a defendant and that injury to another might have been foreseen or reasonably anticipated by a person of ordinary intelligence in the light of the attending circumstances. However, it is not necessary that the particular, exact injury should have been foreseen." [Emphasis added.]

Jury instructions must be considered as a whole. See, e.g., *Schwartz v. Ghaly,* 318 N.W.2d 294 (N.D.1982). Thus an alleged error must be considered in context and not on the basis of isolated sentences. See, e.g., *Besette v. Enderlin Sch. Dist. No. 22,* 310 N.W.2d 759 (N.D.1981). Plaintiffs argue in this case that proximate cause must not be equated with the term "direct cause." In support of this proposition, plaintiffs cite *Froemke v. Otter Tail Power Co.,* 68 N.D. 7, 12, 276 N.W. 146, 148 (N.D.1937), wherein the court states that "proximate cause is not necessarily the last cause, nor the sole cause, but includes any act that aided in producing the result, and without which the result would not have occurred." According to plaintiffs, the trial court's addition of the sentence in question improperly equates "proximate cause" with "direct cause," thus encouraging the jury "to ignore [the] lengthy sequence of medical treatment (or the lack thereof) and instead focus upon only those actions im-

mediately preceding or closest in time to [the] injuries." We do not agree.

In *Moum v. Maercklein*, 201 N.W.2d 399, 402 (N.D.1972), we stated:

> "To constitute actionable negligence, there must be a causal connection between the negligence and the injury sustained; and for the negligence to be the proximate cause of the injury, ... *the injury to the plaintiff must have resulted as a direct consequence of the negligent breach of [the] duty."* [Emphasis added.]

We have continued for many years to recognize the close relationship between negligence and harm, as can be seen from our usual definition of proximate cause: "Proximate cause [is] 'that cause which, as a natural and continuous sequence, unbroken by any controlling intervening cause, produces the injury, and without which it would not have occurred.'" *Johnson v. Minneapolis, St.P. & S.S.M. Ry. Co.*, 54 N.D. 351, 359, 209 N.W. 786, 789 (1926); *Knorr v. K-Mart Corp.*, 300 N.W.2d 47 (N.D.1980).[16] The instruction therefore is not an incorrect statement of the law, although we do not believe the inclusion of the sentence in question is necessary (or perhaps even desirable) to adequately instruct on proximate cause.

Nor can we say that the instruction, taken as a whole, equates proximate cause with the last cause or the sole cause. The instruction states that there may be more than one proximate cause; that negligence of two or more persons may contribute concurrently as proximate causes of the injury; and that proximate cause is a cause which had a substantial part in bringing about the harm or injury either immediately or through happenings which follow one another. In this context, the word "direct"

implies that the chain of causation must not be broken; it in no way implies that proximate cause can be only the last cause or the sole cause.

As to the alleged potential of the added sentence to confuse the jury, we may only consider how this instruction, taken in context, would confuse or mislead an average jury.[17] We do not believe that the instruction on causation is confusing or misleading. The instruction, as a whole, fairly and adequately apprised the jury of the law. As such, the trial court's refusal to give the instruction requested by the plaintiffs cannot be a ground for reversal. See, e.g., *Besette v. Enderlin Sch. Dist. No. 22, supra.* See also *Matter of Estate of Knudsen*, 342 N.W.2d 387 (N.D.1984) [a trial court need not give instructions in the specific language requested by a litigant; instructions which fairly inform the jury of the applicable law are all that is required]; *Leake v. Hagert*, 175 N.W.2d 675 (N.D. 1970) [party's proposed instructions were in essence what the court gave and were a correct statement of the law, thereby making the court's refusal of that party's instructions proper].

Plaintiffs' objection to the court's modification of the causation instruction must also be rejected on two independent procedural grounds in that plaintiffs failed to object to the instruction and, upon moving for a new trial, failed to raise this issue below.

■ Plaintiffs claim that they preserved their objections to the causation instruction through the following dialogue:

> "THE COURT: ... I will take exceptions, Plaintiffs' exceptions first.

---

**16.** The same standard was stated, although not so succinctly, as early as 1913 in *Garraghty v. Hartstein*, 26 N.D. 148, 143 N.W. 390 (1913), by quoting *Christianson v. Chicago, St. P., M. & O. Ry. Co.*, 67 Minn. 94, 69 N.W. 640 (1896). See also Chief Justice Tripp's excellent discussion of the concept of proximate cause in *Pielke v. Chicago, M. & St.P. Ry. Co.*, 5 Dak. 444, 453, 41 N.W. 669, 671 (1889), wherein he states on behalf of the Territorial Supreme Court of Dakota

that proximate cause "is the primary cause, traced back through intervening and intermediate causes, by natural and continuous succession, from the injury resulting to the wrong committed."

**17.** As discussed above in regard to the first issue, Rule 606(b) prohibits examination of the internal aspects of a jury's deliberation.

"MR. HARNEY: Just one. But let me ask this, Your Honor. In this state, if you offer an instruction and it's not given, do you have to make an exception?

"THE COURT: No you do not.

"MR. HARNEY: It's only on the one that you—

"THE COURT: Not requested."

Plaintiffs attempt to construe this discussion as constituting an "automatic" exception to each of the instructions given by the court. Under North Dakota law, counsel must except specifically to a contested instruction, regardless of whether another instruction was proposed on the same issue. Rule 51(c), N.D.R.Civ.P.; *Matter of Estate of Honerud*, 294 N.W.2d 619 (N.D. 1980). By a plain reading of the discussion, it is clear that the court informed plaintiffs' counsel that exception must be taken to any of the instructions—and, of course, any portion of those instructions— not requested by counsel. Because the added sentence in the causation instruction was not requested, an exception to that instruction objecting to the additional language was necessary.

■ It is the responsibility of counsel, even outside counsel, to become familiar with the basic aspects of traditional court procedure in this State. A review of the record demonstrates that the explanation was sufficient to convey to counsel the correct method. Before the court explained to counsel this State's method of objecting to instructions, counsel stated that he had but one objection to make.

This statement, read in conjunction with his question to the court, was made apparently with the correct understanding by counsel that an "automatic" exception is taken to all of plaintiffs' instructions that were requested *but not given*. It is possible that counsel was not aware of the sentence which had been inserted in the instruction. In any event, our rules are plain and unambiguous; and the trial court's explanation of our rules, given as a courtesy, properly described the need to object to any instructions not requested. Because the sentence in question was submitted to counsel as part of the court's proposed instructions, no "automatic" exception applies.

■ Plaintiffs' objection to the instruction is also waived because they failed to raise this issue in their motion for a new trial. "It is well settled that where a motion for a new trial is made in the lower court the party making such a motion is limited on appeal to a review of the grounds presented to the trial court." *Zimbelman v. Lah*, 61 N.D. 65, 67, 237 N.W. 207, 208 (1931).[18] This restriction of appealable issues applies not only to review of a denial of the motion for a new trial, but also to the review of the appeal from the judgment itself or from a denial of a motion for judgment notwithstanding the verdict:

"... [I]n h's motion for a new trial the plaintiff did not challenge this instruction as to its contents or the manner in which it was given. He is therefore in no position to urge this point in this court. In

18. This long-standing rule is derived from our Territorial laws. 1887 Dakota Territory Sess. Laws ch. 21, codified at 1887 Territory of Dakota Code of Civil Procedure § 5094. The statute has been subject to subsequent recodification and changes in language, but its essence, as well as its application, has remained constant over the years. See, e.g., *Lindenberg v. Folson*, 138 N.W.2d 573 (N.D.1965); *Umphrey v. Deery*, 78 N.D. 211, 48 N.W.2d 897 (1951); *State v. Empting*, 21 N.D. 128, 128 N.W. 1119 (1910). The final statutory codification that serves as the basis of the rule, Section 28–18–09, N.D.C.C., has been superseded by Rule 59, N.D.R.Civ.P., and Rules 3 and 28, N.D.R.App.P. But these rules of civil and appellate procedure did not abrogate our case law that limits appellate review to the issues raised on a motion for a new trial where such a motion is made. See, e.g., Explanatory Comments to Rule 35, N.D.R.App.P., concerning the scope of appellate review, which states that "[t]he rule does not change existing appellate practice." This is true even though we have, by Rule 28, N.D.R.App.P., eliminated the assignment-of-errors requirement because the purpose of the rule derived from that requirement is to allow the lower court, in its decision on whether to grant a new trial, to review *all* alleged errors. Except in situations where new rules of civil or appellate procedure clearly abrogate, by the terms of the new rules or by subsequent construction by this court, prior decisions that create specific rules of procedure, the former procedural requirements retain their viability.

*Enget v. Neff,* [77 N.D. 356, 43 N.W.2d 644 (1950)], paragraph 1 of the syllabus, we said:

'Where a motion for a new trial is made in the court below and an appeal is taken from the order denying the motion and from the judgment, alleged erroneous rulings of the trial court which constitute proper grounds for a new trial under Sec. 28–1902 R.C.N.D. 1943, must be presented on the motion; otherwise they will be deemed waived, whether included in the specifications of error upon appeal from the judgment or not.'

That is the precise situation here. The plaintiff seeks a new trial in this court for [the] giving [of] an instruction which he did not challenge in his motion for a new trial addressed to the trial court. He will not now be heard on this point, having waived his right to challenge the instruction by failing to give the trial court an opportunity to consider and pass upon his objections." *Ackerman v. Fischer,* 79 N.D. 51, 55–56, 54 N.W.2d 734, 736 (1952).[19]

As can be seen from the quoted material, this rule forecloses appellate review of alleged errors in instructions which were not raised on the motion for a new trial. See also *Braun v. Martin,* 70 N.D. 216, 293 N.W. 317 (1940); *Isensee Motors v. Godfrey,* 61 N.D. 435, 238 N.W. 550 (1931); *Stoll v. Davis,* 26 N.D. 373, 144 N.W. 433 (1913).

## IV

### PRESUMPTION–OF–TRUTH INSTRUCTION

■ Plaintiffs next argue that the trial court committed prejudicial error by including in the instruction on weight and credibility a statement that witnesses are presumed to tell the truth, thereby impermissibly restricting the right of the jury to weigh the credibility of witnesses. Plain-

tiffs submitted the following requested instruction, but without the italicized material which the trial court added:

### "WEIGHT AND CREDIBILITY

"You are the judges of all questions of fact in this case. You alone must weigh the evidence under these instructions and determine the credibility of those who have testified. As to those matters the Court expresses no opinion.

"In performing this task you may consider the facts and circumstances in the case which tend to strengthen, weaken or contradict one's testimony. You may consider the age, intelligence, and experience of the witness, the strength or weakness of his recollection, how he came to know the facts to which he testified, his possible interest in the outcome of the trial, any bias or prejudice he may have, his manner and appearance, whether he was frank or evasive while testifying and whether his testimony is reasonable or unreasonable.

"If you find a conflict in the evidence, you should reconcile it, if you can, *because each witness is presumed to have told the truth.* If you cannot do so, you have the right to determine whom of the witnesses you will believe, in whole or in part.

"You should give all credible testimony its just and fair weight. You should consider the evidence in this case in light of your common sense and your ordinary experience and observation of human affairs."

As discussed above, jury instructions must be considered as a whole. An alleged error must be considered in context and not on the basis of an isolated phrase. Plaintiffs claim that the added material prevented the jury from exercising its unfettered right to believe or disbelieve the testimony of the witnesses. We disagree.

---

**19.** See also *Montana-Dakota Utilities Company v. Culver,* 80 N.W.2d 541 (N.D.1957); *Goodman v. Mevorah,* 79 N.D. 653, 59 N.W.2d 192 (1953) [on petition for rehearing], and cases cited

therein at 198–201; *Isensee Motors v. Godfrey,* 61 N.D. 435, 238 N.W. 550 (1931), and cases cited therein at 551.

■ Under North Dakota law, witnesses are presumed to be telling the truth. *Cunningham v. Great Northern Ry. Co.,* 73 N.D. 315, 14 N.W.2d 753 (1944). See also *Hendrickson v. Syverson,* 82 N.W.2d 827 (N.D.1957). But the instruction at issue repeatedly emphasizes the great discretion a jury has in evaluating the evidence. The instruction informs the jurors that they alone are the judges of all questions of fact, that they alone must determine the credibility of the witnesses, and that they should give all credible testimony its just and fair weight. The instruction also lists the factors that may be employed in their evaluation of the witnesses. In addition to these points, the instruction states that the jurors have the right to determine whom of the witnesses they will believe, in whole or in part. In this context, the presumption that a witness has told the truth is easily rebuttable; indeed, the other language places such broad discretion upon the jury that the presumption is dissipated almost out of existence. We therefore conclude that the instruction on weight and credibility was not in error.

We also note that, as a procedural matter, plaintiffs' objection to the instruction was waived due to failure to object as well as failure to raise the issue in their motion for a new trial. See discussion at pages 727–728.

## V

### CLOSING ARGUMENT

Plaintiffs' fifth issue on appeal is whether a defense counsel committed prejudicial error during closing argument by allegedly threatening the individual jurors with sub-

standard medical care if they returned a verdict for the plaintiffs. The lower court denied plaintiffs' motion for a new trial on this issue because they failed to present a timely objection "to any of the remarks of defense counsel at final argument." Defense counsel's comments, which are set forth below,[20] occurred before plaintiffs' rebuttal. Ample opportunity to to object to the comments existed at the time the comments were made, immediately after the close of that counsel's remarks, in the fifteen-minute break prior to rebuttal, and following rebuttal, where counsel met in chambers to discuss exhibits. Moreover, counsel had the opportunity to make the objection in front of the jury, at the bench, or in chambers. Instead, plaintiffs' counsel elected only to respond to the questionable comments in his rebuttal.

■ In general, a party must object at the time the alleged irregularity occurs; failure to object acts as a waiver of the claim of error. See, e.g., *Basin Elec. Power Co-op v. Paulson,* 289 N.W.2d 548 (N.D. 1980); *Braun v. Riskedahl,* 150 N.W.2d 577 (N.D.1967); *Bradley v. Krogen,* 67 N.D. 108, 270 N.W. 93 (1936); *Kinneberg v. Kinneberg,* 8 N.D. 311, 79 N.W. 337 (1899). As we stated in *Leach v. Nelson,* 50 N.D. 538, 196 N.W. 755 (1924), if a party wishes to rely upon a claim of prejudice in regard to closing argument, that party must afford the trial court an opportunity to rule upon that objection, and, not having done so, that party cannot now complain. It is also necessary for the party objecting to closing statements to request that the court admonish the jury to disregard the improper portion of the argument. *Klein*

20. "MR. GUNHUS: ...
"Now sometime in the future you may well have the opportunity to meet one of—or both of those men at a community function of some sort or another. PTA meeting, hockey game, whatever. Maybe even one of you get sick. I hope you don't. Or members of your family. Or get hurt in a car accident. And you call upon them to do a CAT scan. Are you gonna say to them, 'I'm sorry that I voted against you and voted for malpractice, Doctor. But I felt sorry for Mrs. Andrews'? Are you gonna say, 'I felt—I feel bad that I voted against you, Doctor, and I voted that you're guilty of malpractice. After all, we were there for eight weeks and we thought we should give her something'? Are you gonna say, 'Well, gee, sorry for voting against you, Doctor. But they had such an impressive lawyer that we had to give 'em something'? Now those are not reasons, folks, for voting for malpractice in this case. If you vote for malpractice, vote it because it's proved, not because you feel sorry for somebody or for some other improper reason."

*v. Harper,* 186 N.W.2d 426 (N.D.1971); *Larson v. Meyer,* 135 N.W.2d 145 (N.D. 1965); *Quam v. Wengert,* 86 N.W.2d 741 (N.D.1957); *State v. Knudson,* 21 N.D. 562, 132 N.W. 149 (1911). Otherwise, the objection is waived.

▆▆▆▆▆ The only exception to the general rule requiring objection to improper closing argument is when the misconduct of counsel is so severe that it affects that party's substantial rights or constitutes a denial of a fair trial, thereby placing an independent duty upon the court to confine the attorney to the permissible bounds of argument, where necessary, and admonish the jury. *Fox v. Bellon,* 136 N.W.2d 134 (N.D.1965); *Bradley v. Krogen, supra;* Rule 103(d), N.D.R.Ev. Counsel must, in closing argument, refrain from potentially prejudicial comments. Statements which could reasonably be interpreted as a threat to the jurors are highly improper and deserve immediate and incisive admonishment to the jury to disregard that portion of the argument.[21] Nonetheless, "[t]he scope and substance of the opening and closing arguments of counsel are under the control and discretion of the trial court, and this exercise of discretion will not be reversed by this court on the ground that an argument to the jury was prejudicial unless a clear abuse of discretion is shown." *State v. Kunkel,* 366 N.W.2d 799, 803 (N.D.1985).

We have carefully reviewed the comments made by attorney Gunhus. We have also considered, as we must, the fact that the trial court, both while witnessing the argument and in its later review of the alleged attorney misconduct in consideration of the motion for a new trial, did not conclude that the closing argument affected the plaintiffs' substantial rights or constituted a denial of a fair trial. Although under one possible interpretation the attorney's comments could be construed as inappropriate, we are unable to conclude that the comments rose to the level requiring independent court action, especially in the context of the complete argument made by the attorney and in light of plaintiffs' rebuttal, wherein plaintiffs' counsel discussed the other attorney's remarks. As such, a failure to object acts as a waiver of the objection. Nor do we believe in our review of the record that the lower court's denial of a new trial on this ground was an abuse of discretion. See, e.g., *Kresel v. Giese,* 231 N.W.2d 780 (N.D.1975).

## VI

### JURY FINDING OF NEGLIGENCE

Plaintiffs next argue that the finding of negligence against O'Hearn, Harrington, and St. Luke's Hospitals compels a finding of proximate cause and liability for damages, and that the trial court failed to correct this omission by erroneously denying their motion for directed verdict and motion for judgment notwithstanding the verdict. Plaintiffs argue that "[w]hile negligence and proximate cause are normally separate elements of proof, proof of negligent medical diagnosis or treatment is sufficient by itself to establish proximate cause where there is any substantial possibility that earlier diagnosis and treatment would have made a difference."[22] If plaintiffs considered this a correct statement of the law, they should have objected to the court's instruction on the duty of a physician—which, incidentally, is identical in relevant part to the plaintiffs' proposed instruction on this issue—that required sepa-

21. Of course, the trial court has other means available to deter inappropriate conduct, such as sanctioning the attorney personally.

22. Although plaintiffs' view finds support from other jurisdictions [see, e.g., *Hicks v. United States,* 368 F.2d 626 (4th Cir.1966) ], our courts have steadfastly held, even in malpractice actions, that a plaintiff must show negligence *and* proximate cause. See, e.g., *Knorr v. K-Mart Corp.,* 300 N.W.2d 47 (N.D.1980); *VanVleet v.*

*Pfeifle,* 289 N.W.2d 781 (N.D.1980); *Winkjer v. Herr,* 277 N.W.2d 579 (N.D.1979); *McDonnell v. Monteith,* 59 N.D. 750, 231 N.W. 854 (1930); *Schoening v. Smith,* 59 N.D. 592, 231 N.W. 278 (1930); *Stoskoff v. Wicklund,* 49 N.D. 708, 193 N.W. 312 (1923). But due to the resolution of the issue on procedural grounds, we have no need to consider our previous decisions and decide whether the exception employed in *Hicks* should be applied under North Dakota law.

rate findings as to negligence and proximate cause:

> "Before a physician can be held liable, the patient must prove by the greater weight of the evidence that the physician negligently failed to administer or prescribe a proper mode of treatment, and in doing so must show that the result complained of was proximately caused by the violation of some rule of accepted medical practice."

The separation of these two elements is also exhibited in the instruction on proximate cause (quoted at page 726), which in this regard is identical to plaintiffs' proposed instruction. Because there was no objection to either of the instructions, they become the law of the case. See, e.g., *Matter of Estate of Honerud, supra.*

Plaintiffs' argument must also be rejected because plaintiffs did *not* make a motion for a directed verdict, which is a prerequisite to a motion for judgment notwithstanding a verdict. See Rule 50(b), N.D.R.Civ.P.

## VII

### JURY FINDING OF NO NEGLIGENCE

The seventh issue plaintiffs raise on appeal is whether the jury, despite its determination that the general partners were negligent, erred as a matter of law in absolving Fargo Clinic and The Neurologic Associates of negligence. Counsel agree that this issue holds significance only if we reverse and remand for a new trial. Because we affirm, the issue is moot. In addition, both sides agreed at oral argument that the proper reading of this portion of the jury verdict entails the finding of the concomitant negligence of these entities; the verdict refers to the negligence of doctors and staff of Fargo Clinic *other than* O'Hearn, and The Neurologic Associates was not listed on the verdict form because the partnership relationship between Harrington and The Neurologic Associates was conceded by defendants. Lastly, this issue was not raised in plaintiffs' motion for a new trial and therefore is not appealable. See discussion at pages 728–729.

## VIII

### COSTS

■ Plaintiffs' final issue concerns costs and disbursements. Plaintiffs first argue that the trial court erred by finding defendants as prevailing parties and allowing costs and disbursements pursuant to Sections 28–26–02 and 28–26–06, N.D.C.C. Section 28–26–02 *allows* the court discretion concerning the taxation of costs for expert-witness fees, while Section 28–26–06 *requires* the clerk to assess certain disbursements against the non-prevailing party. Plaintiffs claim that where, in a tort action, a party prevails on the issue of negligence, that party should not be required to pay the other party's costs and disbursements. We disagree. In order to be considered a prevailing party in a tort action, a party must prevail at least on the issues of negligence and proximate cause. To hold otherwise would subject persons without the potential of legal liability for an alleged wrong to mandatory costs against them. Such an interpretation does not conform with the traditional meaning of "prevailing party."[23] The assessment of costs and disbursements against the plaintiffs in this case pursuant to Sections 28–26–02 and 28–26–06 therefore is correct.

Plaintiffs next argue that the trial court abused its discretion by refusing to grant costs to plaintiffs. Section 28–26–10 provides for the awarding of costs by the court for or against either party. The awarding of costs under this statute is discretionary, and a court's ruling on costs will not be disturbed unless the aggrieved

---

**23.** See *Liebelt v. Saby,* 279 N.W.2d 881 (N.D. 1979); *Hart v. Casterton,* 58 N.D. 657, 227 N.W. 183 (1929); *Farmers' Security Bank of Park River v. Verry,* 42 N.D. 264, 172 N.W. 867 (1921); *Swallow v. First State Bank,* 35 N.D. 323, 160 N.W. 137 (1916); *Paulson v. Sorenson,* 33 N.D. 488, 157 N.W. 473 (1916); *Corbett v. Great Northern Ry. Co.,* 28 N.D. 136, 148 N.W. 4 (1914); *Great Northern Ry. Co. v. Sheyenne Telephone Co.,* 27 N.D. 256, 145 N.W. 1062 (1914). See also *State ex rel. Holloway v. First Am. Bank,* 248 N.W.2d 859 (N.D.1977).

party affirmatively establishes an abuse of discretion. See, e.g., *Moser v. Wilhelm,* 300 N.W.2d 840 (N.D.1980); *Davis v. Davis,* 268 N.W.2d 769 (N.D.1978). Upon review of the record, we conclude that the trial court did not abuse its discretion in denying costs to the plaintiffs.

## IX

## POST–VERDICT COMMUNICATIONS WITH JURORS

One further matter deserves comment. In its order denying plaintiffs' motion for judgment notwithstanding the verdict and for a new trial, the trial court criticized the current lack of guidelines concerning post-verdict communications with jurors by attorneys and their investigators. The lower court stated that "it may be appropriate at this time to set forth certain guidelines which should be followed in cases of alleged jury bias or misconduct." The court went on to state:

"The current practice seems to permit litigants to approach jurors and subject them to interrogation by attorneys and their investigators concerning their conduct as jurors. The better practice would be to bring a matter of juror bias or misconduct to the attention of the Court so that examination could occur in the presence of counsel and the trial judge to assure proper safeguards. A record could then be presented to the appellate court if the decision is appealed. The State of Minnesota has such a procedure which[,] rather than permit the promiscuous interrogation of jurors

by a litigant, brings the matter to the attention of the trial court permitting further examinations under proper safeguards." [Citing *Schwartz v. Minneapolis Suburban Bus Company,* 258 Minn. 325, 104 N.W.2d 301 (1960), and its progeny.]

Our courts have a responsibility to protect jurors from extensive ex parte interrogation by an attorney (or the attorney's representative) who has reason to believe that juror misconduct has occurred.[24] As we discussed in Section I, our policy preventing examination of the mental processes of jury deliberations is long-standing and is accorded great weight. Our rule prevents use of juror affidavits to impeach a verdict except where the alleged misconduct is based upon extraneous prejudicial information, outside influence, or a chance verdict. The purpose of our rule is clear: The jury must be unfettered in its discussions and protected from annoyance and harassment. But when a rule prevents the *use* of certain evidence obtained from a juror but does not reasonably limit the *gathering* of the evidence, the protections provided by the rule often become illusory.

In light of the strong policy considerations underlying Rule 606(b), the great potential for harm, and the recent increase in attempts to impeach jury verdicts,[25] it may be necessary to develop an appropriate rule concerning access to jurors following their rendering of a verdict. But absent extraordinary circumstances, we do not believe it appropriate to change on an ad hoc, case-by-case basis rules of procedure or evidence that have been formally adopted; we have a procedure in place for doing so

**24.** Our concern for protecting jurors from improper post-verdict contacts is exhibited by several subsections of DR 7–108 of our Code of Professional Responsibility:

"(D) After discharge of the jury from further consideration of a case with which a lawyer was connected, the lawyer shall not ask questions of or make comments to a member of that jury that are calculated merely to harass or embarrass the juror or to influence his actions in future jury service.

"(E) A lawyer shall not conduct or cause, by financial support or otherwise, another to conduct a vexatious or harassing investigation of either a venireman or a juror.

"(F) All restrictions imposed by DR 7–108 upon a lawyer also apply to communications with or investigations of members of a family of a venireman or a juror.

"(G) A lawyer shall reveal promptly to the court improper conduct by a venireman or a juror, or by another toward a venireman or a juror or a member of his family, of which the lawyer has knowledge."

**25.** See, e.g., *Mauch v. Manufacturers Sales & Service, Inc., supra; Keyes v. Amundson, supra; Kerzmann v. Rohweder, supra.*

under which full opportunity for discussion and comment is afforded to the entire profession and to the public. Changes in rules are normally accomplished through the Joint Procedure Committee, a standing committee of the Supreme Court. See NDRPR § 8. Change by committee will not be as quick, but the benefit of speed is easily overcome by the greater benefit resulting from thorough deliberation and the combined wisdom of a broad spectrum of the bench and bar.[26]

The judgment, the order denying the motion for a new trial and for judgment notwithstanding the verdict, and the order denying costs and disbursements to plaintiffs and granting taxation of costs against them are affirmed.

MESCHKE, J., and GLASER, HODNY and PAULSON, District Judges, concur.

GLASER, HODNY, and PAULSON, District Judges, participated in place of ERICKSTAD, C.J., and GIERKE and LEVINE, JJ., disqualified.

**26.** One possibility is the following rule: Once an attorney or the representative of an attorney becomes aware, either directly or indirectly, of facts that would create a reasonable inference of juror bias or misconduct, the attorney or the attorney's representative must cease any further investigation and the attorney must, independent of and prior to any motion for a new trial based on that alleged juror bias or misconduct, immediately bring the matter to the attention of the trial court; and, if it appears that the facts justify so doing, the trial court may then summon the juror and permit an examination on the record, under proper safeguards, and in the presence of counsel for all interested parties and the trial judge.